# KIOWA TRIBE OF OKLAHOMA *v.* MANUFACTURING TECHNOLOGIES, INC.

No. 96–1037.   Argued January 12, 1998—Decided May 26, 1998

752

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, SOUTER, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which THOMAS and GINSBURG, JJ., joined, *post*, p. 760.

*R. Brown Wallace* argued the cause for petitioner. With him on the briefs was *Shelia D. Tims.*

*Edward C. DuMont* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler,* and *David C. Shilton.*

*John E. Patterson, Jr.,* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the Assiniboine and Sioux Tribes of the Fort Peck Reservation et al. by *William R. Perry;* for the Cheyenne-Arapaho Tribes of Oklahoma et al. by *Donald R. Wharton* and *Kim Jerome Gottschalk;* for the Choctaw Nation of Oklahoma et al. by *Bob Rabon;* for the Cow Creek Band of Umpqua Tribe of Indians et al. by *Michael J. Wahoske;* for the Fond Du Lac Band of Lake Superior Chippewa by *Dennis J. Peterson* and *Henry M. Buffalo, Jr.;* for the Navajo Nation et al. by *Paul E. Frye;* for the Seminole Nation of Oklahoma et al. by *D. Michael McBride III* and *David A. Mullon, Jr.;* and for

JUSTICE KENNEDY delivered the opinion of the Court.

In this commercial suit against an Indian Tribe, the Oklahoma Court of Civil Appeals rejected the Tribe's claim of sovereign immunity. Our case law to date often recites the rule of tribal immunity from suit. While these precedents rest on early cases that assumed immunity without extensive reasoning, we adhere to these decisions and reverse the judgment.

I

Petitioner Kiowa Tribe is an Indian Tribe recognized by the Federal Government. The Tribe owns land in Oklahoma, and, in addition, the United States holds land in that State in trust for the Tribe. Though the record is vague about some key details, the facts appear to be as follows: In 1990, a tribal entity called the Kiowa Industrial Development Commission agreed to buy from respondent Manufacturing Technologies, Inc., certain stock issued by Clinton-Sherman Aviation, Inc. On April 3, 1990, the then-chairman of the Tribe's business committee signed a promissory note in the name of the Tribe. By its note, the Tribe agreed to pay Manufacturing Technologies $285,000 plus interest. The face of the note recites it was signed at Carnegie, Oklahoma,

---

the Shakopee Mdewakanton Sioux (Dakota) Community et al. by *Steven F. Olson.*

Briefs of *amici curiae* urging affirmance were filed for the State of Oklahoma by *W. A. Drew Edmondson,* Attorney General, and *Neal Leader,* Senior Assistant Attorney General; for the State of South Dakota et al. by *Mark W. Barnett,* Attorney General of South Dakota, and *John Patrick Guhin,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Bruce M. Botelho* of Alaska, *Daniel E. Lungren* of California, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Margery S. Bronster* of Hawaii, *Richard P. Ieyoub* of Louisiana, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Joseph P. Mazurek* of Montana, *Philip T. McLaughlin* of New Hampshire, *Dennis C. Vacco* of New York, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, and *James E. Doyle* of Wisconsin; and for the First National Bank of Altus et al. by *Steven W. Bugg* and *Richard H. Goldberg.*

where the Tribe has a complex on land held in trust for the Tribe. According to respondent, however, the Tribe executed and delivered the note to Manufacturing Technologies in Oklahoma City, beyond the Tribe's lands, and the note obligated the Tribe to make its payments in Oklahoma City. The note does not specify a governing law. In a paragraph entitled "Waivers and Governing Law," it does provide: "Nothing in this Note subjects or limits the sovereign rights of the Kiowa Tribe of Oklahoma." App. 14.

The Tribe defaulted; respondent sued on the note in state court; and the Tribe moved to dismiss for lack of jurisdiction, relying in part on its sovereign immunity from suit. The trial court denied the motion and entered judgment for respondent. The Oklahoma Court of Civil Appeals affirmed, holding Indian tribes are subject to suit in state court for breaches of contract involving off-reservation commercial conduct. The Oklahoma Supreme Court declined to review the judgment, and we granted certiorari. 521 U. S. 1117 (1997).

## II

As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity. See *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 476 U. S. 877, 890 (1986); *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 58 (1978); *United States* v. *United States Fidelity & Guaranty Co.*, 309 U. S. 506, 512 (1940) *(USF&G)*. To date, our cases have sustained tribal immunity from suit without drawing a distinction based on where the tribal activities occurred. In one case, a state court had asserted jurisdiction over tribal fishing "both on and off its reservation." *Puyallup Tribe, Inc.* v. *Department of Game of Wash.*, 433 U. S. 165, 167 (1977). We held the Tribe's claim of immunity was "well founded," though we did not discuss the relevance of where the fishing had taken place. *Id.*, at 168, 172. Nor have we yet drawn a distinction between governmental

and commercial activities of a tribe. See, *e. g., ibid.* (recognizing tribal immunity for fishing, which may well be a commercial activity); *Oklahoma Tax Comm'n* v. *Citizen Band of Potawatomi Tribe of Okla.*, 498 U. S. 505 (1991) (recognizing tribal immunity from suit over taxation of cigarette sales); *USF&G, supra,* (recognizing tribal immunity for coal-mining lease). Though respondent asks us to confine immunity from suit to transactions on reservations and to governmental activities, our precedents have not drawn these distinctions.

Our cases allowing States to apply their substantive laws to tribal activities are not to the contrary. We have recognized that a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country. See *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148–149 (1973); see also *Organized Village of Kake* v. *Egan,* 369 U. S. 60, 75 (1962). To say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit. In *Potawatomi,* for example, we reaffirmed that while Oklahoma may tax cigarette sales by a Tribe's store to nonmembers, the Tribe enjoys immunity from a suit to collect unpaid state taxes. 498 U. S., at 510. There is a difference between the right to demand compliance with state laws and the means available to enforce them. See *id.,* at 514.

The Oklahoma Court of Civil Appeals nonetheless believed federal law did not mandate tribal immunity, resting its holding on the decision in *Hoover* v. *Oklahoma,* 909 P. 2d 59 (Okla. 1995), cert. denied, 517 U. S. 1188 (1996). In *Hoover,* the Oklahoma Supreme Court held that tribal immunity for off-reservation commercial activity, like the decision not to exercise jurisdiction over a sister State, is solely a matter of comity. 909 P. 2d, at 62 (citing *Nevada* v. *Hall,* 440 U. S. 410, 426 (1979)). According to *Hoover,* because the State holds itself open to breach of contract suits, it may allow its citizens to sue other sovereigns acting within the State. We

have often noted, however, that the immunity possessed by Indian tribes is not coextensive with that of the States. See, e. g., Blatchford v. Native Village of Noatak, 501 U. S. 775 (1991). In Blatchford, we distinguished state sovereign immunity from tribal sovereign immunity, as tribes were not at the Constitutional Convention. They were thus not parties to the "mutuality of . . . concession" that "makes the States' surrender of immunity from suit by sister States plausible." Id., at 782; accord, Idaho v. Coeur d'Alene Tribe of Idaho, 521 U. S. 261, 268–269 (1997). So tribal immunity is a matter of federal law and is not subject to diminution by the States. Three Affiliated Tribes, supra, at 891; Washington v. Confederated Tribes of Colville Reservation, 447 U. S. 134, 154 (1980).

Though the doctrine of tribal immunity is settled law and controls this case, we note that it developed almost by accident. The doctrine is said by some of our own opinions to rest on the Court's opinion in Turner v. United States, 248 U. S. 354 (1919). See, e. g., Potawatomi, supra, at 510. Though Turner is indeed cited as authority for the immunity, examination shows it simply does not stand for that proposition. The case arose on lands within the Creek Nation's "public domain" and subject to "the powers of [the] sovereign people." 248 U. S., at 355. The Creek Nation gave each individual Creek grazing rights to a portion of the Creek Nation's public lands, and 100 Creeks in turn leased their grazing rights to Turner, a non-Indian. He built a long fence around the land, but a mob of Creek Indians tore the fence down. Congress then passed a law allowing Turner to sue the Creek Nation in the Court of Claims. The Court of Claims dismissed Turner's suit, and the Court, in an opinion by Justice Brandeis, affirmed. The Court stated: "The fundamental obstacle to recovery is not the immunity of a sovereign to suit, but the lack of a substantive right to recover the damages resulting from failure of a government or its

officers to keep the peace." *Id.*, at 358. "No such liability existed by the general law." *Id.*, at 357.

The quoted language is the heart of *Turner*. It is, at best, an assumption of immunity for the sake of argument, not a reasoned statement of doctrine. One cannot even say the Court or Congress assumed the congressional enactment was needed to overcome tribal immunity. There was a very different reason why Congress had to pass the Act: "The tribal government had been dissolved. Without authorization from Congress, the Nation could not then have been sued in any court; at least without its consent." *Id.*, at 358. The fact of tribal dissolution, not its sovereign status, was the predicate for the legislation authorizing suit. *Turner*, then, is but a slender reed for supporting the principle of tribal sovereign immunity.

*Turner*'s passing reference to immunity, however, did become an explicit holding that tribes had immunity from suit. We so held in *USF&G*, saying: "These Indian Nations are exempt from suit without Congressional authorization." 309 U. S., at 512 (citing *Turner*, *supra*, at 358). As sovereigns or quasi sovereigns, the Indian Nations enjoyed immunity "from judicial attack" absent consent to be sued. 309 U. S., at 513–514. Later cases, albeit with little analysis, reiterated the doctrine. *E. g.*, *Puyallup*, 433 U. S., at 167, 172–173; *Santa Clara Pueblo*, 436 U. S., at 58; *Three Affiliated Tribes*, 476 U. S., at 890–891; *Blatchford*, *supra*, at 782; *Coeur d'Alene*, *supra*, at 268.

The doctrine of tribal immunity came under attack a few years ago in *Potawatomi*, *supra*. The petitioner there asked us to abandon or at least narrow the doctrine because tribal businesses had become far removed from tribal self-governance and internal affairs. We retained the doctrine, however, on the theory that Congress had failed to abrogate it in order to promote economic development and tribal self-sufficiency. *Id.*, at 510. The rationale, it must be said, can be challenged as inapposite to modern, wide-ranging tribal

enterprises extending well beyond traditional tribal customs and activities. JUSTICE STEVENS, in a separate opinion, criticized tribal immunity as "founded upon an anachronistic fiction" and suggested it might not extend to off-reservation commercial activity. *Id.*, at 514–515 (concurring opinion).

There are reasons to doubt the wisdom of perpetuating the doctrine. At one time, the doctrine of tribal immunity from suit might have been thought necessary to protect nascent tribal governments from encroachments by States. In our interdependent and mobile society, however, tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians. See *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145 (1973); *Potawatomi, supra; Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44 (1996). In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims.

These considerations might suggest a need to abrogate tribal immunity, at least as an overarching rule. Respondent does not ask us to repudiate the principle outright, but suggests instead that we confine it to reservations or to noncommercial activities. We decline to draw this distinction in this case, as we defer to the role Congress may wish to exercise in this important judgment.

Congress has acted against the background of our decisions. It has restricted tribal immunity from suit in limited circumstances. See, *e. g.,* 25 U. S. C. § 450f(c)(3) (mandatory liability insurance); § 2710(d)(7)(A)(ii) (gaming activities). And in other statutes it has declared an intention not to alter it. See, *e. g.,* § 450n (nothing in financial-assistance program is to be construed as "affecting, modifying, diminishing, or otherwise impairing the sovereign immunity from suit enjoyed by an Indian tribe"); see also *Potawatomi,* 498

U. S., at 510 (discussing Indian Financing Act of 1974, 88 Stat. 77, 25 U. S. C. § 1451 *et seq.*).

In considering Congress' role in reforming tribal immunity, we find instructive the problems of sovereign immunity for foreign countries. As with tribal immunity, foreign sovereign immunity began as a judicial doctrine. Chief Justice Marshall held that United States courts had no jurisdiction over an armed ship of a foreign state, even while in an American port. *Schooner Exchange* v. *McFaddon,* 7 Cranch 116 (1812). While the holding was narrow, "that opinion came to be regarded as extending virtually absolute immunity to foreign sovereigns." *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S. 480, 486 (1983). In 1952, the State Department issued what came to be known as the Tate Letter, announcing the policy of denying immunity for the commercial acts of a foreign nation. See *id.,* at 486–487. Difficulties in implementing the principle led Congress in 1976 to enact the Foreign Sovereign Immunities Act, resulting in more predictable and precise rules. See *id.,* at 488–489 (discussing the Foreign Sovereign Immunities Act of 1976, 28 U. S. C. §§ 1604, 1605, 1607).

Like foreign sovereign immunity, tribal immunity is a matter of federal law. *Verlinden, supra,* at 486. Although the Court has taken the lead in drawing the bounds of tribal immunity, Congress, subject to constitutional limitations, can alter its limits through explicit legislation. See, *e. g., Santa Clara Pueblo, supra,* at 58.

In both fields, Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests. The capacity of the Legislative Branch to address the issue by comprehensive legislation counsels some caution by us in this area. Congress "has occasionally authorized limited classes of suits against Indian tribes" and "has always been at liberty to dispense with such tribal immunity or to limit it." *Potawatomi, supra,* at 510. It has not yet done so.

In light of these concerns, we decline to revisit our case law and choose to defer to Congress. Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation. Congress has not abrogated this immunity, nor has petitioner waived it, so the immunity governs this case. The contrary decision of the Oklahoma Court of Civil Appeals is

*Reversed.*

JUSTICE STEVENS, with whom JUSTICE THOMAS and JUSTICE GINSBURG join, dissenting.

"Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148–149 (1973). There is no federal statute or treaty that provides petitioner, the Kiowa Tribe of Oklahoma, any immunity from the application of Oklahoma law to its off-reservation commercial activities. Nor, in my opinion, should this Court extend the judge-made doctrine of sovereign immunity to pre-empt the authority of the state courts to decide for themselves whether to accord such immunity to Indian tribes as a matter of comity.

I

"The doctrine of sovereign immunity is an amalgam of two quite different concepts, one applicable to suits in the sovereign's own courts and the other to suits in the courts of another sovereign." *Nevada* v. *Hall,* 440 U. S. 410, 414 (1979). In the former category, the sovereign's power to determine the jurisdiction of its own courts and to define the substantive legal rights of its citizens adequately explains the lesser authority to define its own immunity. *Kawananakoa* v. *Polyblank,* 205 U. S. 349, 353 (1907). The sovereign's claim to immunity in the courts of a second sovereign,

however, normally depends on the second sovereign's law. *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 136 (1812). An Indian tribe's assertion of immunity in a state judicial proceeding is unique because it implicates the law of three different sovereigns: the tribe itself, the State, and the Federal Government.

As the Court correctly observes, the doctrine of tribal immunity from judicial jurisdiction "developed almost by accident." *Ante*, at 756. Its origin is attributed to two federal cases involving three of the Five Civilized Tribes. The former case, *Turner* v. *United States*, 248 U. S. 354 (1919), rejected a claim against the Creek Nation, whose tribal government had been dissolved. The Court explains why that case provides no more than "a slender reed" of support for the doctrine even in federal court. *Ante*, at 757. In the latter case, *United States* v. *United States Fidelity & Guaranty Co.*, 309 U. S. 506 (1940) *(USF&G)*, the Federal Government sought to recover royalties due under coal leases that the United States had executed on behalf of the Choctaw and Chickasaw Nations. The Court held that the Government's action was not barred by a prior judgment against it entered by a different federal court. The holding that the prior judgment was "void in so far as it undertakes to fix a credit against the Indian Nations," *id.*, at 512, rested on two grounds. First, in a companion case decided that day,[1] the Court ruled that "cross-claims against the United States are justiciable only in those courts where Congress has consented to their consideration," *ibid.;* but no statute had authorized the prior adjudication of the cross-claim against the Federal Government. The second ground was the statement, supported by a citation of *Turner* and two Eighth Circuit decisions addressing the immunity of two of the Five Civilized Tribes, that *"[t]hese* Indian Nations are exempt from suit without Congressional authorization." 309 U. S.,

---

[1] *United States* v. *Shaw*, 309 U. S. 495 (1940).

at 512 (emphasis added). At most, the holding extends only to federal cases in which the United States is litigating on behalf of a tribe. Moreover, both *Turner* and *USF&G* arose out of conduct that occurred on Indian reservations.

In subsequent cases, we have made it clear that the States have legislative jurisdiction over the off-reservation conduct of Indian tribes, and even over some on-reservation activities.[2] Thus, in litigation that consumed more than a decade and included three decisions by this Court, we rejected a Tribe's claim that the doctrine of sovereign immunity precluded the State of Washington from regulating fishing activities on the Puyallup Reservation. *Puyallup Tribe, Inc.* v. *Department of Game of Wash.*, 433 U. S. 165, 175–176 (1977). It is true that as an incident to that important holding, we vacated the portions of the state-court decree that were directed against the Tribe itself. *Id.*, at 172–173. That action, however, had little practical effect because we upheld the portions of the decree granting relief against the entire class of Indians that was represented by the Tribe. Although Justice Blackmun, one of the "strongest supporters of Indian rights on the Court,"[3] wrote separately to express his "doubts . . . about the continuing vitality in this day of the doctrine of tribal immunity as it was enunciated in *United States* v. *United States Fidelity & Guaranty Co.*," *id.*, at 178, our opinion did not purport to extend or to explain the doctrine. Moreover, as the Tribe's predominant argument was that "the state courts of Washington are without

---

[2] "The general notion drawn from Chief Justice Marshall's opinion in *Worcester* v. *Georgia*, 6 Pet. 515, 561; *The Kansas Indians*, 5 Wall. 737, 755–757; and *The New York Indians*, 5 Wall. 761, that an Indian reservation is a distinct nation within whose boundaries state law cannot penetrate, has yielded to closer analysis when confronted, in the course of subsequent developments, with diverse concrete situations." *Organized Village of Kake* v. *Egan*, 369 U. S. 60, 72 (1962).

[3] Dussias, Heeding the Demands of Justice: Justice Blackmun's Indian Law Opinions, 71 N. D. L. Rev. 41, 43 (1995).

jurisdiction to regulate fishing activities on its reservation," *id.*, at 167, we had no occasion to consider the validity of an injunction relating solely to off-reservation fishing.

In several cases since *Puyallup*, we have broadly referred to the tribes' immunity from suit, but "with little analysis," *ante*, at 757, and only considering controversies arising on reservation territory. In *Santa Clara Pueblo v. Martinez*, 436 U. S. 49 (1978), a Tribe member and her daughter who both lived on the Santa Clara Pueblo reservation sued in federal court to challenge the validity of a tribal membership law. We agreed with the Tribe that the court lacked jurisdiction to decide this "intratribal controvers[y] affecting matters of tribal self-government and sovereignty." *Id.*, at 53. Our decision in *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P. C.*, 476 U. S. 877 (1986), held that North Dakota could not require a Tribe's blanket waiver of sovereign immunity as a condition for permitting the Tribe to sue private parties in state court. That condition was "unduly intrusive on the Tribe's common law sovereign immunity, and thus on its ability to govern itself according to its own laws," because it required "that the Tribe open itself up to the coercive jurisdiction of state courts for *all* matters occurring on the reservation." *Id.*, at 891.[4] Most recently, we held that a federal court lacked authority to entertain Oklahoma's claims for unpaid taxes on cigarette sales made on tribal trust land, which is treated the same as reservation territory. *Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Tribe of Okla.*, 498 U. S. 505, 509–511 (1991).[5]

---

[4] The particular counterclaims asserted by the private party, which we assumed would be barred by sovereign immunity, concerned the construction of a water-supply system on the Tribe's reservation. *Three Affiliated Tribes*, 476 U. S., at 881.

[5] The Court cites *Blatchford v. Native Village of Noatak*, 501 U. S. 775 (1991), and *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U. S. 261 (1997), as having "retained the doctrine" of tribal sovereign immunity. *Ante*, at 757. Each of those cases upheld a State's sovereign immunity under

In sum, we have treated the doctrine of sovereign immunity from judicial jurisdiction as settled law, but in none of our cases have we applied the doctrine to purely off-reservation conduct. Despite the broad language used in prior cases, it is quite wrong for the Court to suggest that it is merely following precedent, for we have simply never considered whether a tribe is immune from a suit that has no meaningful nexus to the tribe's land or its sovereign functions. Moreover, none of our opinions has attempted to set forth any reasoned explanation for a distinction between the States' power to regulate the off-reservation conduct of Indian tribes and the States' power to adjudicate disputes arising out of such off-reservation conduct. Accordingly, while I agree with the Court that it is now too late to repudiate the doctrine entirely, for the following reasons I would not extend the doctrine beyond its present contours.

## II

Three compelling reasons favor the exercise of judicial restraint.

First, the law-making power that the Court has assumed belongs in the first instance to Congress. The fact that Congress may nullify or modify the Court's grant of virtually unlimited tribal immunity does not justify the Court's performance of a legislative function. The Court is not merely announcing a rule of comity for federal judges to observe; it is announcing a rule that pre-empts state power. The reasons that undergird our strong presumption against construing federal statutes to pre-empt state law, see, e. g., Cipollone v. Liggett Group, Inc., 505 U. S. 504, 516, 518 (1992), apply with added force to judge-made rules.

In the absence of any congressional statute or treaty defining the Indian tribes' sovereign immunity, the creation of

the Eleventh Amendment from being sued in federal court by an Indian tribe. The passing references to tribes' immunity from suit did not discuss the scope of that immunity and were, of course, dicta.

a federal common-law "default" rule of immunity might in theory be justified by federal interests. By setting such a rule, however, the Court is not deferring to Congress or exercising "caution," *ante*, at 759—rather, it is creating law. The Court fails to identify federal interests supporting its extension of sovereign immunity—indeed, it all but concedes that the present doctrine lacks such justification, *ante*, at 758—and completely ignores the State's interests. Its opinion is thus a far cry from the "comprehensive pre-emption inquiry in the Indian law context" described in *Three Affiliated Tribes* that calls for the examination of "not only the congressional plan, but also 'the nature of the state, federal, and tribal interests at stake . . . .'" 476 U. S., at 884 (quoting *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 145 (1980)). Stronger reasons are needed to fill the gap left by Congress.

Second, the rule is strikingly anomalous. Why should an Indian tribe enjoy broader immunity than the States, the Federal Government, and foreign nations? As a matter of national policy, the United States has waived its immunity from tort liability and from liability arising out of its commercial activities. See 28 U. S. C. §§ 1346(b), 2674 (Federal Tort Claims Act); §§ 1346(a)(2), 1491 (Tucker Act). Congress has also decided in the Foreign Sovereign Immunities Act of 1976 that foreign states may be sued in the federal and state courts for claims based upon commercial activities carried on in the United States, or such activities elsewhere that have a "direct effect in the United States." § 1605(a)(2). And a State may be sued in the courts of another State. *Nevada* v. *Hall*, 440 U. S. 410 (1979). The fact that the States surrendered aspects of their sovereignty when they joined the Union does not even arguably present a legitimate basis for concluding that the Indian tribes retained—or, indeed, ever had—any sovereign immunity for off-reservation commercial conduct.

Third, the rule is unjust. This is especially so with respect to tort victims who have no opportunity to negotiate for a waiver of sovereign immunity; yet nothing in the Court's reasoning limits the rule to lawsuits arising out of voluntary contractual relationships. Governments, like individuals, should pay their debts and should be held accountable for their unlawful, injurious conduct.

I respectfully dissent.