[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13673

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:10-cv-24524-PAS


JOHN V. FURRY,
as personal representative of the Estate and survivors of Tatiana H. Furry,

Plaintiff - Appellant,


versus


MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,
MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,
d.b.a. Miccosukee Resort & Gaming, et al.,

Defendants - Appellees.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 29, 2012)

Before MARCUS and BLACK, Circuit Judges, and EVANS,[*] District Judge.

_____

[*] Honorable Orinda Evans, United States District Judge for the Northern District of
Georgia, sitting by designation.

MARCUS, Circuit Judge:

The appeal presents us with tragic facts; it also yields a straightforward legal resolution. John Furry, as personal representative of the estate of his daughter Tatiana Furry, appeals the district court's order granting the Miccosukee Tribe's[1] motion to dismiss his complaint. Furry complained that the Miccosukee Tribe violated 18 U.S.C. § 1161 and Florida's dram shop law by knowingly serving excessive amounts of alcohol to his daughter, who then got in her car, drove off while intoxicated, and ended up in a fatal head-on collision with another vehicle on a highway just outside Miami. The Miccosukee Tribe moved to dismiss the complaint on the jurisdictional ground that it was immune from suit under the doctrine of tribal sovereign immunity. In its order granting the tribal defendants' motion to dismiss, the district court determined that tribal sovereign immunity barred it from entertaining the suit.

We agree. The Supreme Court has made clear that a suit against an Indian tribe is barred unless the tribe has clearly waived its immunity or Congress has expressly and unequivocally abrogated that immunity. Furry argues that both of

---

[1] Like the district court, we use the term "Miccosukee Tribe" to refer collectively to the full list of tribal defendants: Miccosukee Tribe of Indians of Florida; Miccosukee Tribe of Indians of Florida, d.b.a. Miccosukee Resort & Gaming; Miccosukee Resort & Gaming; Miccosukee Corporation; Miccosukee Indian Bingo; Miccosukee Indian Bingo & Gaming; Miccosukee Enterprises; and Miccosukee Police Department.

2

these exceptions have been met here, but these arguments are ultimately without merit. Accordingly, we affirm the judgment of the district court.

## I.

The underlying facts of this wrongful death suit, as alleged, are both straightforward and heartbreaking.[2] On the night of January 20, 2009, and into the early morning hours of January 21, Tatiana Furry was at the Miccosukee Resort & Gaming, a gambling and resort facility in Miami-Dade County owned and operated by the tribal defendants. Miccosukee Resort & Gaming also includes several bars and restaurants that sell or serve alcoholic beverages on the premises. Pursuant to 18 U.S.C. § 1161,[3] the tribal defendants applied for and received a

---

[2] Because this case was decided on a motion to dismiss, we take as true the facts as alleged in Furry's complaint and attached exhibits. See Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam).

[3] Title 18 U.S.C. § 1161 provides in full:

> The provisions of sections 1154, 1156, 3113, 3488, and 3669, of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register.

18 U.S.C. § 1161. The statute was enacted with the intent "to remove federal discrimination that resulted from the imposition of liquor prohibition on Native Americans." Rice v. Rehner, 463 U.S. 713, 733 (1983). All of the cross-referenced sections of Title 18 of the United States Code involve federal prohibition in Indian country. In other words, by enacting § 1161 Congress in large part removed federal prohibition in Indian country while "delegat[ing] a portion of its authority to the tribes as well as to the States." Rehner, 463 U.S. at 733.

license from the State of Florida Department of Business and Professional Regulation, Division of Alcoholic Beverages & Tobacco to sell and furnish alcohol.

According to the complaint, the tribal defendants and their employees "furnished Tatiana [Furry] with a substantial amount of alcoholic beverages." They did so "despite knowing that she was habitually addicted to the use of any or all alcoholic beverages." The defendants knew of Ms. Furry's habitual addiction to alcohol because, prior to the night in question, they "had served Tatiana a substantial amount of alcohol on multiple occasions on their premises." At some point in the early morning hours of January 21, employees of the defendants witnessed Ms. Furry get in her car and leave the premises "in an obviously intoxicated condition."

A short time later, Ms. Furry was involved in a head-on collision with another vehicle on U.S. Route 41 (the Tamiami Trail). Ms. Furry was killed as a result of the collision. After the accident, Ms. Furry's blood alcohol level was measured at .32, four times Florida's legal limit of .08.

On December 17, 2010, Ms. Furry's father, John Furry, filed an eight-count complaint in the United States District Court for the Southern District of Florida, alleging violations of 18 U.S.C. § 1161 and Florida's dram shop act, codified at

Fla. Stat. § 768.125,[4] as well as various state law negligence claims. The

Miccosukee Tribe answered by filing a motion to dismiss, contending, among

other things, that the district court lacked subject matter jurisdiction due to tribal

sovereign immunity. After full briefing, the district court entered an order

dismissing Furry's complaint based on a lack of subject matter jurisdiction

because the Miccosukee Tribe was immune from suit.

## II.

"We review de novo the district court's dismissal of a complaint for

sovereign immunity." Sanderlin v. Seminole Tribe of Fla., 243 F.3d 1282, 1285

(11th Cir. 2001); accord Florida v. Seminole Tribe of Fla., 181 F.3d 1237, 1240-

41 (11th Cir. 1999); Fla. Paraplegic, Ass'n v. Miccosukee Tribe of Indians of Fla.,

166 F.3d 1126, 1128 (11th Cir. 1999). Tribal sovereign immunity is a

jurisdictional issue. See Sanderlin, 243 F.3d at 1285; Seminole Tribe, 181 F.3d at

1241.

---

[4] Fla. Stat. § 768.125 provides in full:

A person who sells or furnishes alcoholic beverages to a person of lawful drinking
age shall not thereby become liable for injury or damage caused by or resulting
from the intoxication of such person, except that a person who willfully and
unlawfully sells or furnishes alcoholic beverages to a person who is not of lawful
drinking age or who knowingly serves a person habitually addicted to the use of
any or all alcoholic beverages may become liable for injury or damage caused by
or resulting from the intoxication of such minor or person.

The fundamental starting point for the resolution of this appeal is that "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998) (emphasis added); accord Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla., 498 U.S. 505, 509 (1991) ("Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories. Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." (internal quotation marks and citation omitted)); Sanderlin, 243 F.3d at 1285; Seminole Tribe, 181 F.3d at 1241.

Furry contends that both of these exceptions to tribal sovereign immunity have been met here. He claims that Congress abrogated tribal sovereign immunity in enacting 18 U.S.C. § 1161, which authorizes state regulation (including licensing) of tribal liquor transactions. See Rice v. Rehner, 463 U.S. 713, 728-29 (1983). Furry also suggests that the Miccosukee Tribe has waived any claim to tribal sovereign immunity by applying for a state liquor license, which involved executing an affidavit agreeing that the licensed premises would be subject to inspection by state authorities for the purpose of monitoring compliance with state liquor laws. Furry adds that the Miccosukee Tribe's affidavit and application for a

6

Florida liquor license amounted to a broad agreement to be bound by Florida law in all respects, including subjecting the Miccosukee Tribe to private actions sounding in tort.

We address each claim in turn, but first provide a brief overview of the Supreme Court's most recent decision addressing the scope of the tribal sovereign immunity doctrine, because it sets forth the current breadth of the doctrine. The Court in Kiowa Tribe began by recognizing that the doctrine of tribal immunity is now settled law and that the Court's precedents establish that an Indian tribe "is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." 523 U.S. at 754 (citing Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g, 476 U.S. 877, 890 (1986); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978); United States v. U.S. Fid. & Guar. Co., 309 U.S. 506, 512 (1940)). The Court further recognized that its past precedents did not draw any distinctions based on whether the tribal activities occurred on or off of the reservation, or whether the tribal activities were governmental or commercial in nature. Id. at 754-55 (citing Potawatomi, 498 U.S. 505; Puyallup Tribe, Inc. v. Dep't of Game, 433 U.S. 165, 167 (1977)). The Court also noted that "the immunity possessed by Indian tribes is not coextensive with that of the States" and that "tribal immunity is a matter of federal law and is not subject to diminution by

7

the States." Id. at 755-56.

But, as Furry rightly points out, the Supreme Court's opinion does not stop there. The Court also observed that the doctrine of tribal immunity "developed almost by accident" from Justice Brandeis's opinion for the Court in Turner v. United States, 248 U.S. 354 (1919). Kiowa Tribe, 523 U.S. at 756. The Court noted that Turner "simply does not stand for that proposition," that "[i]t is, at best, an assumption of immunity for the sake of argument, not a reasoned statement of doctrine," and that it "is but a slender reed for supporting the principle of tribal sovereign immunity." Id. at 756-57. The Court recognized, however, that "Turner's passing reference to immunity" later became "an explicit holding that tribes had immunity from suit" and that "[l]ater cases, albeit with little analysis, reiterated the doctrine." Id. at 757 (citing Puyallup, 433 U.S. at 167, 172-173; Santa Clara Pueblo, 436 U.S. at 58; Three Affiliated Tribes, 476 U.S. at 890-891; Blatchford v. Native Vill. of Noatak, 501 U.S. 775, 782 (1991); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 268 (1997)).

The Supreme Court further recognized the tension between its broad historical recognition of tribal immunity and the much narrower category of cases in which the doctrine still reflects sound policy today:

There are reasons to doubt the wisdom of perpetuating the doctrine.

8

At one time, the doctrine of tribal immunity from suit might have been thought necessary to protect nascent tribal governments from encroachments by States. In our interdependent and mobile society, however, tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians. In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims.

Id. at 758 (citations omitted); see also id. at 766 (Stevens, J., dissenting) (describing the rule that tribal sovereign immunity broadly applies as "unjust" and "especially so with respect to tort victims who have no opportunity to negotiate for a waiver of sovereign immunity"). But, notably, the Court declined to act on these concerns, reasoning that although "[t]hese considerations might suggest a need to abrogate tribal immunity, at least as an overarching rule," it would instead "defer to the role Congress may wish to exercise in this important judgment." Id. at 758 (majority opinion). The Court recognized that Congress has the power to limit tribal immunity and has previously legislated against the backdrop of the Court's decisions establishing that tribal immunity applies as a rule. Id. at 758-59. The Court concluded that "Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests" and that "[t]he capacity of the

9

Legislative Branch to address the issue by comprehensive legislation counsels some caution by us in this area." Id. at 759.

We share these concerns about the broad scope of tribal sovereign immunity. But at the end of the day, notwithstanding the Supreme Court's reservations about the tenuous origins of the tribal immunity doctrine and the wisdom of the doctrine's current breadth (both points that Furry emphasizes heavily), the Court could not have been clearer about placing the ball in Congress's court going forward: "[W]e decline to revisit our case law and choose to defer to Congress." Id. at 760.

The legal question before us thus remains two-fold: (1) whether Congress has abrogated tribal immunity or authorized the type of suit at issue; or (2) whether the tribal defendants have waived their immunity.

**A.**

Furry claims that 18 U.S.C. § 1161, read in concert with the Supreme Court's decision in Rehner, establishes that Congress has subjected the tribes to private tort actions, at least those arising out of the violation of state liquor laws.[5]

---

[5] Furry also refers once to Fla. Stat. § 285.16(2), which provides: "The civil and criminal laws of Florida shall obtain on all Indian reservations in this state and shall be enforced in the same manner as elsewhere throughout the state." But this statute cannot factor into the analysis. Only Congress, and not a state legislature, can abrogate tribal immunity, because "tribal immunity is a matter of federal law and is not subject to diminution by the States." Kiowa Tribe, 523 U.S. at 756.

10

Title 18 U.S.C. § 1161 provides that other <u>penal</u> provisions of Title 18 of the United States Code relating to federal prohibition do not apply in Indian country so long as a liquor-related "act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country." 18 U.S.C. § 1161. Essentially, Furry urges us to read the statutory phrase "in conformity . . . with the laws of the State," along with the fact that tribal liquor transactions have long been heavily regulated and are not an area where the tribes have been left to their own self-governance, in order to establish that the Miccosukee Tribe is not immune from the instant suit.

Furry claims that <u>Rehner</u> supports this broad reading, in particular the Supreme Court's language that "there is no tradition of sovereign immunity that favors the Indians" with respect to the regulation of liquor transactions and that a "State has an unquestionable interest in the liquor traffic that occurs within its borders." 463 U.S. at 724-25. But accepting the composite of Furry's argument would require us to ignore the fact that the Supreme Court was speaking to a wholly different issue. In <u>Rehner</u>, the Supreme Court interpreted § 1161 in the context of whether state regulations were preempted by federal law. More specifically, the precise question before the Court in <u>Rehner</u> was "whether the

11

State of California may require a federally licensed Indian trader, who operates a general store on an Indian reservation, to obtain a state liquor license in order to sell liquor for off-premises consumption." Id. at 715. Rehner was not a case in which an Indian tribe's immunity from suit sounding in tort or, for that matter, based on anything else was even at issue. See id. at 715.

The Supreme Court answered the question before it in the affirmative. The Court explained that "[t]he role of tribal sovereignty in pre-emption analysis varies in accordance with the particular notions of sovereignty that have developed from historical traditions of tribal independence." Id. at 719 (emphasis added) (internal quotation marks omitted). The Court examined the history of liquor regulation in Indian country and observed that there was no tradition of tribal self-governance in liquor transactions; rather, "[t]he colonists regulated Indian liquor trading before this Nation was formed, and Congress exercised its authority over these transactions as early as 1802" and "imposed complete prohibition by 1832." Id. at 722.

Having established that the tribal sale of liquor was not protected from regulatory oversight by historical notions of tribal self-governance, the Court then turned to the proper balance of regulatory authority between the federal government and the States. The Court noted that there was a "historical tradition

12

of concurrent state and federal jurisdiction over the use and distribution of alcoholic beverages in Indian country." Id. at 724. Because of 18 U.S.C. § 1161, the Court determined that the application of California's liquor licensing scheme to a tribal trader was not preempted by federal law. Id. at 725-26. The Court observed that "[t]he legislative history of § 1161 indicates both that Congress intended to remove federal prohibition on the sale and use of alcohol imposed on Indians in 1832, and that Congress intended that state laws would apply of their own force to govern tribal liquor transactions as long as the tribe itself approved these transactions by enacting an ordinance." Id. at 726. The Court thus read Congress's enactment of § 1161 as having been "intended to delegate a portion of its authority to the tribes as well as to the States." Id. at 733. Therefore, the application of California's liquor licensing regulations did not "impair a right granted or reserved by federal law." Id. at 734 (internal quotation marks omitted).

**1.**

Furry first suggests that Rehner completely removed all Indian liquor transactions from the scope of the tribal immunity doctrine. He claims that "[i]f there is no tradition of sovereignty in relation to liquor sales and distribution in Indian Country, and if a Tribe engages in liquor transactions under the aegis of state laws, which it has accepted and benefited from, then there is no claim to

13

sovereign immunity from a suit in which state liquor laws have been violated."

Notably absent from Rehner, however, was any analysis of tribal immunity from suit or any indication that § 1161 brought the area of liquor transactions in Indian country wholly outside of the sphere of tribal immunity.

Indeed, to accept Furry's argument on this point would be wholly inconsistent with subsequent precedent both from the Supreme Court and this Circuit. While § 1161 requires conformity with state law and tribal ordinance, it says nothing at all about the means of enforcement if the tribe violates state law. There is no dispute that substantive state law does govern the tribal sale of liquor, and that a state can require an Indian tribe that wants to sell alcohol on the reservation to first obtain a liquor license. Moreover -- although the issue is not before us -- a state may presumably revoke an Indian tribe's liquor license if the tribe fails to conduct its liquor business in conformity with the laws of that state.

Yet the mere applicability of state law (and, therefore, the tribe's lack of self-governance in the area) is not sufficient to cast aside a tribe's immunity from suit, as the Supreme Court made plain in Kiowa Tribe:

> To say substantive state laws apply to off-reservation conduct . . . is not to say that a tribe no longer enjoys immunity from suit. In Potawatomi, for example, we reaffirmed that while Oklahoma may tax cigarette sales by a Tribe's store to nonmembers, the Tribe enjoys immunity from a suit to collect unpaid state taxes. There is a

14

> difference between the right to demand compliance with state laws
> and the means available to enforce them.

Kiowa Tribe, 523 U.S. at 755 (citations omitted).  While § 1161 requires liquor transactions in Indian country to be in conformity with state law (and tribal ordinance), it does not expressly authorize private citizens to enforce a tribe's compliance with the state's panoply of tort law by going to court.

And in this Circuit, we have repeatedly held that an Indian tribe enjoys immunity from suit even in areas where the tribe's conduct is regulated by statute. Thus, for example, in Fla. Paraplegic, we held that the substantive provisions of the Americans with Disabilities Act ("ADA"), including the requirement that public accommodations be accessible to disabled individuals, apply to Indian tribes, but that the Miccosukee Tribe was nonetheless immune from a private enforcement action brought under the statute.  166 F.3d at 1128-35.  As we plainly stated, "a statute can apply to an entity without authorizing private enforcement actions against that entity."  Id. at 1128.  We explained, relying on the Supreme Court's decision in Kiowa Tribe:

> [W]hether an Indian tribe is subject to a statute and whether the tribe
> may be sued for violating the statute are two entirely different
> questions.  As the Supreme Court bluntly stated in Kiowa Tribe,
> "[t]here is a difference between the right to demand compliance with
> state laws and the means available to enforce them."  This principle,

15

> which simply spells out the distinction between a right and a remedy, applies with equal force to federal laws.

Id. at 1130 (second alteration in original) (citation omitted); see also id at 1134-35 (observing that the "juxtaposition of [the ADA's] applicability to the Miccosukee Tribe with the tribe's sovereign immunity from suit . . . may be troubling," but "immunity doctrines inevitably carry within them the seeds of occasional inequities," and "Congress could enact a statute with substantive limitations on Indian tribes without providing any means for most individuals protected by the law to enforce their rights in federal court" (internal quotation marks and alteration omitted)).

Similarly, in Seminole Tribe, a panel of this Court held that although an Indian tribe's gambling operations are indisputably governed by the Indian Gaming Regulatory Act ("IGRA"), the Seminole Tribe was nonetheless immune from a suit brought by the State of Florida seeking a declaration that the tribe was engaged in unlawful gambling in violation of the federal statute and Florida law and an injunction preventing such gambling in the absence of a Tribal-State compact. 181 F.3d at 1239. Absent clear congressional abrogation or a tribe's own express waiver, we held that tribal immunity must apply, notwithstanding the State's concern that the holding would "effectively nullify its rights under IGRA

16

by leaving it with no forum in which it can prevent the Tribe from violating IGRA with impunity." Id. at 1243. As our precedents make clear, a tribe may retain its immunity from suit even where its conduct is governed by state or federal law. Accordingly, we have no basis to conclude that Indian tribes' liquor transactions, solely by virtue of being subject to state and federal regulation, fall entirely outside the scope of the tribal immunity doctrine.

## 2.

Furry also claims that even if tribal immunity applies as a general matter, by enacting 18 U.S.C. § 1161 Congress has abrogated the tribes' immunity against private dram shop actions. But as we have made plain, "Congress may abrogate a sovereign's immunity only by using statutory language that makes its intention unmistakably clear." Seminole Tribe, 181 F.3d at 1242; accord Sanderlin, 243 F.3d at 1289; Fla. Paraplegic, 166 F.3d at 1131 ("Congress abrogates tribal immunity only where the definitive language of the statute itself states an intent either to abolish Indian tribes' common law immunity or to subject tribes to suit under the act."). Moreover, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Sanderlin, 243 F.3d at 1285 (quoting Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985)); see also Fla. Paraplegic,166 F.3d at 1130 ("Although Indian tribes are

17

domestic dependent nations whose sovereignty is not absolute but may be limited by Congress, federal encroachment upon Indian tribes' natural rights is a serious undertaking, and we should not assume lightly that Congress intended to restrict Indian sovereignty through a piece of legislation." (internal quotation marks and citation omitted)).

Congressional enactment of 18 U.S.C. § 1161 hardly demonstrates an "unmistakably clear" intention to subject the Indian tribes to private tort suits. See Sanderlin, 243 F.3d at 1289; Seminole Tribe, 181 F.3d at 1242. As the Supreme Court explained in Rehner, Congress did two things in enacting 18 U.S.C. § 1161: it "remove[d] federal discrimination that resulted from the imposition of liquor prohibition on Native Americans," and "delegate[d] a portion of its authority to the tribes as well as to the States, so as to fill the void that would be created by the absence of the discriminatory federal prohibition." 463 U.S. at 733. Moreover, our case law is clear that congressional abrogation must come from "the definitive language of the statute itself" and that "legislative history and inferences from general statutory language are insufficient." Fla. Paraplegic, 166 F.3d at 1131 (internal quotation marks omitted). Nowhere in the text of § 1161 is there any mention of tribal immunity from suit, much less an express and unequivocal abrogation of tribal immunity with respect to private lawsuits alleging that an

18

Indian tribe has violated state tort law. Congress well understood how to expressly subject an Indian tribe to private suit in state or federal court; it simply did not do so by enacting 18 U.S.C. § 1161. Cf. Santa Clara Pueblo, 436 U.S. at 58-59 (holding that Congress did not abrogate tribal immunity from suit in the Indian Civil Rights Act of 1968, aside from the sole remedial provision expressly providing that "the 'privilege of the writ of habeas corpus' is made 'available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe'" (quoting 25 U.S.C. § 1303)); Fla. Paraplegic, 166 F.3d at 1133 (observing that a provision of the ADA expressly waiving states' Eleventh Amendment immunity for actions brought under the statute "demonstrates Congress's full understanding of the need to express unambiguously its intent to abrogate sovereign immunity where it wishes its legislation to have that effect").[6]

Although the federal courts have not weighed in on the precise issue of whether § 1161 abrogates tribal immunity from private tort suits based on state dram shop acts or other tort law, the parties point us to several state appellate courts that have addressed this precise issue. Most of these courts have concluded

_____

[6] That provision of the ADA, 42 U.S.C. § 12202, has since been held unconstitutional by the Supreme Court. See Bd. of Trustees of the Univ. of Ala. v. Garrett, 531 U.S. 356 (2001). The Supreme Court recognized, however, that 42 U.S.C. § 12202 is an example of Congress "unequivocally intend[ing]" to "abrogate the States' Eleventh Amendment immunity." Id. at 363.

that § 1161 does not authorize the kind of suit Furry attempts to commence here, because neither the text of § 1161 nor the Supreme Court's decision in Rehner come close to demonstrating that Congress has clearly authorized private suits against an Indian tribe based on violations of a state's liquor laws.  See, e.g., Foxworthy v. Puyallup Tribe of Indians Ass'n, 169 P.3d 53, 56-57 (Wash. Ct. App. 2007) ("Foxworthy disregards Rehner's narrow holding, which by its own language limits waiver of tribal sovereignty to the states' regulation of alcohol licensing and distribution.  Rehner does not expand such waiver to private lawsuits."); Filer v. Tohono O'Odham Nation Gaming Enter., 129 P.3d 78, 83 (Ariz. Ct. App. 2006) ("A Congressional waiver of tribal immunity must be unequivocal and explicit.  Section 1161, 18 U.S.C., however, does not even mention tribal immunity, much less waive it for private dram shop actions." (citations omitted)); Holguin v. Ysleta del Sur Pueblo, 954 S.W.2d 843, 845 (Tex. App. 1997) ("[D]espite the public policy function served by private dram shop suits, tribal sovereign immunity protects the Tribe from private suits for personal injuries resulting from non-compliance with the [Texas Dram Shop] Act.").[7]

---

[7] Furry instead relies on the one state court decision that has gone the other way, Bittle v. Bahe, 192 P.3d 810 (Okla. 2008), where the Oklahoma Supreme Court, over strong dissent, held that § 1161, read together with Rehner, abrogated tribal immunity from any suit based on state laws related to alcohol, including private tort suits.  See id. at 823.  Notwithstanding the admonition of the United States Supreme Court in Kiowa Tribe that "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce

Furry's claim that the combination of 18 U.S.C. § 1161 and Rehner constitutes an express abrogation of the Miccosukee Tribe's sovereign immunity from private tort suits is therefore ultimately without merit.

**B.**

Also without merit is Furry's claim that the Miccosukee Tribe waived its immunity from private tort actions by applying for a state liquor license. As we have recognized on many occasions, "[t]he Supreme Court has made it plain that waivers of tribal sovereign immunity cannot be implied on the basis of a tribe's actions, but must be unequivocally expressed." Sanderlin, 243 F.3d at 1286 (quoting Seminole Tribe, 181 F.3d at 1243); see Santa Clara Pueblo, 436 U.S. at 58 (noting that waivers of sovereign immunity "cannot be implied but must be unequivocally expressed" (quoting United States v. Testan, 424 U.S. 392, 399 (1976))). Thus, Furry plainly must establish that the Miccosukee Tribe "expressly and unmistakably waived its right to sovereign immunity from suit." Sanderlin,

them," 523 U.S. at 755, the Oklahoma Supreme Court determined that private tort actions to enforce compliance with state liquor laws were permissible because the "state law remedy to recover money damages furthers the legitimate objectives of the state's liquor laws," Bittle, 192 P.3d at 823. Although the Oklahoma Supreme Court's analysis does not bind this Court in any way, we also find it unpersuasive and inconsistent with precedents from this Court and the United States Supreme Court, which have established that congressional abrogation of tribal immunity must be express and unequivocal. Cf. Bittle, 192 P.3d at 829, 833 (Kauger, J., dissenting) (observing that the majority opinion "ignores controlling precedents" and that "[i]t takes a great leap of jurisprudence to determine that Rice v. Rehner is dispositive of the issue of sovereign immunity as it relates to private dram shop actions").

21

243 F.3d at 1286.

He has not done so. Furry claims that the Miccosukee Tribe's application for a liquor license amounted to a broad promise to be bound by Florida law and an "acceptance of state law as the quid pro quo for its alcoholic beverage operation." The first problem with this argument is that there has not been any such broad promise to abide by Florida law. Rather, the sum and substance of the record evidence filed by Furry as an exhibit below to support this claim is an affidavit submitted with the Miccosukee Tribe's liquor license application in which applicants must swear or affirm that they "agree that the place of business, if licensed, may be inspected and searched during business hours or at any time business is being conducted on the premises without a search warrant by Officers of the Division of Alcoholic Beverages and Tobacco, the Sheriff, his Deputies, and Police Officers for purposes of determining compliance with the beverage and cigarette laws."

At no point in the liquor license application or the accompanying affidavit did the Miccosukee Tribe waive its immunity or consent to be subject to suit of any kind, much less to a private dram shop action. At most, the Miccosukee Tribe's application means that the tribe has acquiesced to the authority of state regulators by allowing law enforcement to inspect and search its premises. And

beyond the affidavit and application, Furry has provided us with no other language from the Miccosukee Tribe purporting to amount to an express waiver. Moreover, we are also barred by precedent from implying or inferring waiver from the Miccosukee Tribe's conduct, such as the tribe electing to serve alcoholic beverages with the benefit of a state liquor license. See Seminole Tribe, 181 F.3d at 1243. Furry's claim of waiver must fail because there is an insurmountable gap between an affidavit agreeing that a licensed premises is subject to inspection by state authorities and an unequivocally expressed waiver of immunity from all private tort actions.

Our decisions in Sanderlin and Seminole Tribe are instructive, and further support this straightforward conclusion. In Sanderlin, we affirmed the district court's dismissal of a former tribal employee's disability discrimination suit, rejecting the employee's argument that the Seminole Tribe waived its immunity from lawsuits brought under the Rehabilitation Act by accepting federal funds under contracts that included a general promise to comply with the Rehabilitation Act. 243 F.3d at 1286. We held that "[t]he contracts for federal financial assistance in which [Chief] Billie promised that the Tribe would not discriminate in violation of federal civil rights laws merely convey[ed] a promise not to discriminate" and that they "in no way constitute[d] an express and unequivocal

23

waiver of sovereign immunity." Id. at 1289.

And in Seminole Tribe, a panel of this Court affirmed the district court's dismissal of Florida's lawsuit seeking declaratory and injunctive relief preventing the Seminole Tribe from engaging in gaming operations not authorized by the IGRA.  181 F.3d at 1239.  In Seminole Tribe, Florida argued that "the Tribe, by electing to engage in gaming subject to regulation under IGRA, waived its own immunity from this suit to compel compliance" with the IGRA.  Id. at 1242.  The panel rejected this argument, reasoning that to accept it would be "patently inconsistent" with the rule that "waivers of tribal sovereign immunity cannot be implied on the basis of a tribe's actions, but must be unequivocally expressed."  Id. at 1243.  We also noted that a contrary conclusion would be "no more than a misuse of the word 'express,'" defined as "[m]anifested by direct and appropriate language, as distinguished from that which is inferred from conduct."  Id. (alteration in original) (quoting Black's Law Dictionary 580 (6th ed. 1990)).

In this case, the analogous situation to Sanderlin would have been if the Miccosukee Tribe had specifically promised to comply with Florida's dram shop statute in the process of applying for its liquor license.  It is clear, however, that the Miccosukee Tribe never made any such promise merely by agreeing that its premises would be subject to inspection by state authorities.  Moreover, our

24

holding in <u>Sanderlin</u> suggests that even if the Miccosukee Tribe had made a specific promise to comply with Florida's dram shop law, this could not, without more, constitute an express and unequivocal waiver of its immunity from suit. Similarly, based on the reasoning underlying our holding in <u>Seminole Tribe</u> that waiver may not be inferred or implied from a tribe's conduct, Furry's argument that the Miccosukee Tribe has waived its immunity by applying for a state liquor license and electing to serve alcohol with the benefit of that license fails to demonstrate an unequivocal and express waiver of tribal immunity. In short, the Miccosukee Tribe has not waived its sovereign immunity in this case.

## C.

Finally, Furry suggests that we should treat the aggregation of his arguments as amounting to more than the sum of their parts. Even if the individual abrogation or waiver arguments are not enough to carry the day on their own, Furry suggests that we should piece together the various components he relies upon -- 18 U.S.C. § 1161, <u>Rice v. Rehner</u>, the Supreme Court's language in <u>Kiowa Tribe</u> expressing reservations about the tribal immunity doctrine, and the Miccosukee Tribe's application for a liquor license -- and conclude that, taken together, these components are enough to subject the Miccosukee Tribe to private suit.

While we are sympathetic to the real equities cutting in Furry's favor, we cannot reconcile this claim with binding case precedent. Cobbling together a new exception to tribal immunity would directly conflict with the Supreme Court's straightforward doctrinal statement, repeatedly reiterated in the holdings of this Circuit, that an Indian tribe is subject to suit in state or federal court "only where Congress has authorized the suit or the tribe has waived its immunity." Kiowa Tribe, 523 U.S. at 754 (emphasis added); Sanderlin, 243 F.3d at 1285; Seminole Tribe, 181 F.3d at 1241; Fla. Paraplegic, 166 F.3d at 1130-31. We are also unpersuaded by the suggestion that the two theories can be mixed or added together, taking a little bit of abrogation and a little bit of waiver to create a wholesale exception to the doctrine of tribal immunity. Abrogation and waiver are two entirely different concepts that involve two entirely different actors: Congress in the case of abrogation, and the Indian tribe itself in the case of waiver. Cf. Seminole Tribe, 181 F.3d at 1241 & n.5 (noting that although some courts have "muddled the distinctions" between abrogation and waiver by using the blanket term "waiver" for both, the two "are actually quite different and will be considered separately"). Abrogation requires a congressional determination that, as a matter of federal law, Indian tribes shall be subject to certain kinds of suit. Waiver, on the other hand, occurs when the tribe itself consents to the jurisdiction of the state

26

or federal courts, through, for example, a provision in a commercial contract. See, e.g., Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla., 63 F.3d 1030, 1048 (11th Cir. 1995). Moreover, both abrogation and waiver require the use of express and unmistakably clear language by either Congress or the tribe, see Sanderlin, 243 F.3d at 1286, 1289; Seminole Tribe, 181 F.3d at 1241-43; Fla. Paraplegic, 166 F.3d at 1130-31, which renders implausible the very idea of partial abrogation or partial waiver. The long and short of it is that we are hard pressed to see how Congress could half-abrogate a tribe's immunity or how an Indian tribe could half-consent to suit, much less how the two could be added together yielding something more. In short, this claim too provides us with no sound basis to conclude that the Miccosukee Tribe is subject to private suit sounding in tort.

### III.

The doctrine of tribal sovereign immunity may well be anachronistic and overbroad in its application, especially when applied to shield from suit even the most sophisticated enterprises of Indian tribes, including commercial activities -- such as the sale of alcohol -- that have obvious and substantial impacts on non-tribal parties. But it remains the law of the land until Congress or the Supreme Court tells us otherwise. Accordingly, the district court's dismissal of Furry's complaint for lack of subject matter jurisdiction must be, and is, **AFFIRMED**.

27