# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| FLYING T RANCH, INC, a Washington corporation,<br><br>    Appellant,<br><br>        v.<br><br>STILLAGUAMISH TRIBE OF INDIANS, a federally recognized Indian Tribe,<br><br>    Respondent,<br><br>SNOHOMISH COUNTY, a Washington state municipal corporation,<br><br>    Defendant. | No. 85739-8-I<br><br>ORDER WITHDRAWING AND SUBSTITUTING OPINION |

The court has determined that the opinion should be withdrawn and a substitute opinion filed; now, therefore, it is

ORDERED that the opinion filed on June 3, 2024 is withdrawn; and it is further

ORDERED that a substitute published opinion shall be filed.

_____
Birk, J.

_____         _____
Feldman, J.                          Dwyer, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| FLYING T RANCH, INC, a Washington corporation, | No. 85739-8-I |
| Appellant, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| STILLAGUAMISH TRIBE OF INDIANS, a federally recognized Indian Tribe, | |
| Respondent, | |
| SNOHOMISH COUNTY, a Washington state municipal corporation, | |
| Defendant. | |

BIRK, J. — Flying T Ranch Inc. appeals the dismissal of its lawsuit to quiet title to certain land against the Stillaguamish Tribe of Indians (Tribe) based on tribal sovereign immunity. Flying T agrees the Tribe enjoys the immunity traditionally enjoyed by sovereign powers, but the parties dispute the scope of that immunity. The land is not tribal land, so Flying T argues the Tribe's immunity is equal only to the immunity a foreign sovereign would have, and that immunity, Flying T argues, does not bar its quiet title claim under the "immovable property" exception. We conclude a foreign sovereign enjoys immunity as directed by the political branches of government and would not face process directed by the judiciary alone. When the Tribe is afforded immunity equal to a foreign sovereign, it may be sued over its

objection only when allowed by Congress, and to hold otherwise would unfaithfully lessen its immunity in comparison to that traditionally enjoyed by sovereign powers. We therefore affirm.

I

Flying T filed a complaint in Snohomish County Superior Court pleading it is a Washington corporation domiciled in Snohomish county, with its principal place of business at 18808 State Route 530 Northeast, Arlington, Washington. Flying T's complaint sought to quiet title to certain land against the Tribe, acknowledged in the complaint to be a tribal government.

According to its allegations, Flying T owns a parcel of land lying along the North Fork of the Stillaguamish River. Opposite the river, the parcel is bounded on the north by a former railroad right-of-way, now the White Horse Trail. To the west of Flying T's parcel, the river and the railroad right-of-way converge, making a triangular piece of land bounded on its three sides by Flying T's parcel, the river, and the railroad right-of-way. The triangular piece of land is composed of parts of two parcels west of Flying T's. It is accessible from Flying T's neighboring parcel, but cut off by the railroad right-of-way from the rest of the two westerly parcels of which it is part. Flying T asserts title to this piece of land by adverse possession.

To support its claim of adverse possession, Flying T alleges a former owner of its parcel, Robert Olsen, repaired and maintained a fence enclosing the disputed triangular piece of land together with Flying T's parcel starting in at least 1961. Flying T alleges that since at least 1962, this barbed wire fence has run in a straight continuous line along the railroad right-of-way. It alleges that without permission

of the true owners, the fence marked the boundary line separating the area from the railroad right-of-way and from the portions of the westerly parcels lying north of the fence. Olsen used the land to keep and graze livestock. In 1974, Olsen conveyed the Flying T parcel to Edwin and Antoinette Tanis. Edwin Tanis continued Olsen's practice of repairing and maintaining the fence. In 1990, a court entered judgment against the Tanises and the sheriff sold the parcel to Bruce and Tammy Blakey. The Blakeys continued the practice of repairing and maintaining the fence, excluding others from the enclosed area, and using the land to keep and graze livestock. In 1991, the Blakeys conveyed their parcel to Flying T, and since then it has continuously repaired and maintained the fence, excluding all others from the enclosed area without the permission of the title owners and using the enclosed land to keep and graze livestock.

Flying T alleges that Snohomish County obtained title to one of the westerly parcels in 1995. After Flying T commenced this action and a week before the superior court heard the Tribe's motion to dismiss based on tribal sovereign immunity, Snohomish County conveyed its parcel to the Tribe. Flying T alleges that the Tribe obtained title to the other westerly parcel in 2021. Flying T alleges— and the Tribe has not controverted—that before Snohomish County and the Tribe came into title of these parcels, they were privately held and not part of any tribal land or reservation.

Flying T commenced this action to quiet title in November 2022. The Tribe moved to dismiss under CR 12(b)(1), CR 12(b)(2), CR 12(b)(3), CR 12(b)(6), and CR 12(b)(7), all based on its having tribal sovereign immunity from Flying T's

claims.[1]  In support of its motion, the Tribe attached three documents, including a declaration by Sara Thitipraserth, director of the Tribe's Natural Resources Department.  Thitipraserth stated the Tribe purchased its parcel along with seven other parcels, totaling about 143.4 acres along 1.2 miles of the North Fork of Stillaguamish River.  The Tribe acquired these lands for habitat restoration actions aimed to increase the productivity and abundance of Puget Sound Chinook salmon.  The parcels were acquired using funds from a conservation grant from the National Oceanic and Atmospheric Administration, through the Washington State Recreation and Conservation Office, that required the Tribe to protect those lands in perpetuity with a deed of right for salmon recovery.  Stillaguamish River salmon are a cultural keystone species that support activities essential for the

---

[1] A challenge to the court's subject matter jurisdiction under CR 12(b)(1) may be either "facial or factual." Outsource Servs. Mgmt., LLC v. Nooksack Bus. Corp., 172 Wn. App. 799, 806, 292 P.3d 147 (2013), aff'd on other grounds, 181 Wn.2d 272, 333 P.3d 380 (2014).  Once it is challenged, the party asserting subject matter jurisdiction bears the burden of proof on its existence. Id. at 807.  A facial challenge puts at issue the sufficiency of the pleadings. Id. at 806-07.  A denial of a facial challenge under CR 12(b)(1) based on the complaint alone or the complaint supplemented by undisputed facts is reviewed de novo. Id. at 807.  A factual challenge requires the trial court to weigh evidence to resolve disputed jurisdictional facts and its factual determinations will be accepted by an appellate court unless clearly erroneous. Id.

In determining a challenge to personal jurisdiction under CR 12(b)(2), the trial court has discretion to rely on written submissions, or it may hold a full evidentiary hearing. Id.  Once it is challenged, the party asserting personal jurisdiction bears the burden of proof to establish its existence. Id.  If the trial court determines personal jurisdiction based on the pleadings and the undisputed facts before it, this court reviews the determination de novo. Id.

Because we conclude federal law requires that Flying T's complaint be dismissed, Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 791, 134 S. Ct. 2024, 188 L. Ed. 2d 1071 (2014), it is not necessary to determine whether the dismissal is properly characterized as a matter of Washington procedural law as a facial dismissal for lack of subject matter jurisdiction under CR 12(b)(1) or a dismissal for lack of personal jurisdiction under CR 12(b)(2).

4

continuation of the Tribe's living culture. As the Stillaguamish River salmon runs face extinction, so do many aspects of the Tribe's culture, community, and treaty reserved rights. The Tribe preserves its way of life through the use of these parcels as conservation land to protect and restore salmon in the Stillaguamish River.[2]

The superior court granted the Tribe's motion to dismiss pursuant to CR 12(b)(1)-(3) and CR 12(b)(6) and dismissed the action with prejudice. The court denied Flying T's motion for reconsideration. Flying T filed a notice of appeal or discretionary review directed to the Washington Supreme Court. The Washington Supreme Court transferred the appeal to this court. After Flying T filed its initial notice of appeal, it sought clarification in the superior court based on Snohomish County's conveyance of its parcel to the Tribe. The superior court entered a further order dismissing Snohomish County from the case and dismissing all claims

---

[2] In the superior court, Flying T objected to the Tribe's submission of documents outside the pleadings as improper to the extent its motion was based on CR 12(b)(6). Flying T did not assert that the Tribe could not rely on undisputed facts outside the pleadings under CR 12(b)(1) and CR 12(b)(2), and did not indicate that it disputed the extrinsic facts the Tribe proffered. Washington authority supports converting CR 12(b)(1) and CR 12(b)(2) motions to summary judgment motions if they rely on matter extrinsic to the pleadings. See Ace Novelty Co. v. M. W. Kasch Co., 82 Wn.2d 145, 146, 152, 508 P.2d 1365 (1973) (noting the superior court considered the moving party's affidavit that stated at no time had it done business within Washington and treated the CR 12(b) motion for lack of personal or subject matter jurisdiction as a motion for summary judgment); Puget Sound Bulb Exch. v. Metal Bldg. Insulation, Inc., 9 Wn. App. 284, 289, 513 P.2d 102 (1973) ("If matters outside the pleadings are presented to the court on a motion to dismiss for lack of personal jurisdiction under CR 12(b)(2) the motion is to be treated as a motion for summary judgment."). Thus, any error in the consideration of extrinsic evidence lay only in the timing of hearing the motion to dismiss, which was heard as an ordinary civil motion, instead of with the 28 calendar days' notice afforded for a summary judgment motion under CR 56. Flying T articulates no prejudice based on the timing of the proceedings before the superior court, and does not object to the consideration of these submissions on appeal.

against the Tribe based on tribal sovereign immunity. A commissioner of this court accepted Flying T's amended notice of appeal and denied the Tribe's motion to dismiss the appeal on timeliness grounds.

II

On appeal, Flying T contends the Tribe's sovereign immunity does not extend to Flying T's claims, arguing they fall within a traditional exception to the doctrine of sovereign immunity for " 'immovable property.' " The Tribe disputes that an immovable property exception was ever "universally applied" to assertions of sovereign immunity and further argues the justifications for such a rule do not apply in the case of a domestic tribe. The Tribe asserts that, in the absence of its consent to suit, only Congress can abrogate its immunity.[3] Whether tribal sovereign immunity applies is a question of federal law this court reviews de novo. Auto. United Trades Org. v. State, 175 Wn.2d 214, 222, 226, 285 P.3d 52 (2012).

Past Washington authority permitted quiet title claims like Flying T's against tribes, recognizing an "in rem" exception to tribal sovereign immunity. Anderson & Middleton Lumber Co. v. Quinault Indian Nation, 130 Wn.2d 862, 869, 929 P.2d 379 (1996) held the superior court had in rem jurisdiction over the plaintiff's lawsuit based on the language of the Indian General Allotment Act of 1887, 25 U.S.C. §§ 331-358, repealed in part by Pub. L. 106-462, and County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 252, 112 S.

---

[3] The court received *amicus curiae* briefs supporting affirmance from the Sauk-Suiattle, Jamestown S'Klallam, Kalispel, Makah, Nooksack, Port Gamble S'Klallam, Puyallup, Quinault, Samish, Snoqualmie, Squaxin Island, and Suquamish Tribes.

6

Ct. 683, 116 L. Ed. 2d 687 (1992).  Relying on Anderson, Smale v. Noretep, 150 Wn. App. 476, 484, 208 P.3d 1180 (2009) held that exercising jurisdiction over in rem proceedings did not implicate tribal sovereign immunity, and therefore a quiet title claim based on adverse possession could proceed against a tribe.  But the rationale of these authorities was disavowed in Upper Skagit Indian Tribe v. Lundgren, 584 U.S. 554, 558, 138 S. Ct. 1649, 200 L. Ed. 2d 931 (2018), which held Yakima did not justify an in rem exception to tribal sovereign immunity. Yakima interpreted the General Allotment Act to allow the imposition of in rem state taxes on land that had been fee-patented under that law.  Id. at 559.  Yakima was a statutory interpretation case that "sought only to interpret a relic of a statute in light of a distinguishable precedent; it resolved nothing about the law of sovereign immunity."  Id.  Because tribal sovereign immunity is a question of federal law and the United States Supreme Court has disavowed the interpretation of federal law on which Anderson and Smale relied, those decisions do not now determine the outcome here.  Indeed, Flying T argues that they are consistent with its argument, but it does not argue that they are controlling.[4]

III

A

Tribes "possess the 'common-law immunity from suit traditionally enjoyed by sovereign powers.' "  Lac du Flambeau Band of Lake Superior Chippewa

---

[4] If the United States Supreme Court had not clearly disavowed Anderson's rationale, it would remain binding on this court.  A decision by the Washington Supreme Court is binding on all lower courts in the state.  1000 Va. Ltd. P'ship v. Vertecs Corp., 158 Wn.2d 566, 578, 146 P.3d 423 (2006).

Indians v. Coughlin, 599 U.S. 382, 387, 143 S. Ct. 1689, 216 L. Ed. 2d 342 (2023) (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S. Ct. 1670, 56 L. Ed. 2d 106 (1978)). The United States Supreme Court has "repeatedly emphasized that tribal sovereign immunity, absent a clear statement of congressional intent to the contrary, is the 'baseline position.' " Id. (quoting Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 790, 134 S. Ct. 2024, 188 L. Ed. 2d 1071 (2014)). "[T]he suability of . . . the Indian Nations, whether directly or by cross-action, depends upon affirmative statutory authority." United States v. U. S. Fid. & Guar. Co., 309 U.S. 506, 514, 60 S. Ct. 653, 84 L. Ed. 894 (1940). "Congress has consistently reiterated its approval of the immunity doctrine." Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla., 498 U.S. 505, 510, 111 S. Ct. 905, 112 L. Ed. 2d 1112 (1991). "[T]ribal immunity is a matter of federal law and is not subject to diminution by the States." Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 756, 118 S. Ct. 1700, 140 L. Ed. 2d 981 (1998). A court must dismiss an action against a tribe if entertaining it would contravene the tribe's federal tribal sovereign immunity. Bay Mills, 572 U.S. at 791. Tribal sovereign immunity may be waived by a tribe or abrogated by Congress, id. at 788-89, but the parties do not assert that either has occurred here.

The United States Supreme Court has applied tribal sovereign immunity in settings otherwise governed by federal statutory law, not confined to tribal lands, and involving commercial activities. In Santa Clara Pueblo, the plaintiffs filed lawsuits against a tribe under the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301-1303. 436 U.S. at 52-53. The court held that in the absence of any

8

"unequivocal expression of contrary legislative intent," sovereign immunity barred the lawsuits against the Santa Clara Pueblo Tribe. Id. at 58-59. In Kiowa, the court declined to "confine" tribal sovereign immunity to reservations or to noncommercial activities and deferred "to the role Congress may wish to exercise in this important judgment." 523 U.S. at 758. The court held the Kiowa Tribe enjoyed immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation because Congress had not abrogated this immunity. Id. at 760. In Bay Mills, the court held Congress's abrogation of tribal immunity in the Indian Gaming Regulatory Act, 25 U.S.C. § 2701-2721, applied to gaming on, but not off, tribal lands, so Michigan was barred from suing Bay Mills to enjoin the operation of a casino. 572 U.S. at 787, 804. The court said, "[W]e have time and again" treated tribal sovereign immunity as settled law and dismissed any suit against a tribe absent congressional authorization or tribal waiver, and "[t]he baseline position, we have often held, is tribal immunity." Id. at 789-90. Under Bay Mills, the Tribe is immune from Flying T's claims given the absence of the Tribe's consent or abrogation of its immunity by Congress.

B

Flying T concedes the Tribe has immunity, but argues its immunity does not extend to Flying T's claims to quiet title, because, Flying T says, its suit is "outside the scope of the common law immunity." Flying T argues that under the immovable property exception, "a sovereign who purchases property in the territory of another sovereign does so in the character of a private party and enjoys no immunity from

9

suit in actions regarding rights of possession or title to the property." But none of Flying T's arguments establish that an immovable property exception has ever existed under which courts adjudicated claims independently of the direction of the political branches of government.

1

Flying T relies first on dicta in The Schooner Exchange v. McFaddon, a case in which American claimants asserted title to a ship which, by the time of their lawsuit, was "a national armed vessel, commissioned by, and in the service of the emperor of France." 11 U.S. 116, 146, 3 L. Ed. 287 (1812). Extending immunity, the court held it was "a principle of public law, that national ships of war, entering the port of a friendly power open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction." Id. at 145-46. In dicta, based on the possibility of a court's exercising jurisdiction over a foreign sovereign's property in its territory, the court said, "A prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction; he may be considered as so far laying down the prince, and assuming the character of a private individual." Id. at 145. Based on this language, Flying T argues that in acquiring non-tribal land on the open market in Washington, the Tribe comes to the land as a private party subject to the territorial jurisdiction of the Washington courts.

This argument overlooks the reasoning of The Schooner Exchange and the next century and a half of American practice. The court in The Schooner Exchange

10

never doubted the authority of a territorial sovereign over foreign sovereigns and their property within its territory, and thus, over the ship in question:

> The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.

> All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source.

Id. at 136. But the existence of this authority did not determine whether the judicial branch would exercise it.

As the court later explained, "[F]oreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 486, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983). "[A] major consideration for the rule enunciated in The Schooner Exchange is the embarrassing consequences which judicial rejection of a claim of sovereign immunity may have on diplomatic relations." Nat'l City Bank of N.Y. v. Republic of China, 348 U.S. 356, 360-61, 75 S. Ct. 423, 99 L. Ed. 389 (1955). The doctrine of foreign sovereign immunity "is one of implied consent by the territorial sovereign to exempt the foreign sovereign from its 'exclusive and absolute' jurisdiction, the implication deriving from standards of public morality, fair dealing, reciprocal self-interest, and respect for the 'power and dignity' of the foreign sovereign." Id. at 362 (quoting The Schooner Exchange, 11 U.S. at 136-37, 143-44).

11

It became the practice of American courts to defer to the political branches on whether to take jurisdiction over actions against foreign sovereigns. <u>Verlinden</u>, 461 U.S. at 486. Until legislation by Congress discussed below, "the State Department" was "the normal means of suggesting to the courts that a sovereign be granted immunity from a particular suit."[5] <u>Nat'l City Bank</u>, 348 U.S. at 360. The State Department urged a state court to extend immunity in at least one reported case involving a title dispute. In <u>Knocklong Corp. v. Kingdom of Afghanistan</u>, the Kingdom of Afghanistan had acquired fee ownership of real property in Kings Point, New York. 6 Misc. 2d 700, 700, 167 N.Y.S.2d 285 (Nassau County Ct. 1957). The plaintiff claimed competing title based on a tax deed. <u>Id.</u> Because Afghanistan used the property "to house the person of the Chief Representative of Afghanistan to the United Nations" and "to serve as the office of, and repository of records for, the Permanent Delegation of Afghanistan to the United Nations," the State Department urged the New York state court to dismiss the action as barred by foreign sovereign immunity. <u>Id.</u> at 700-01. The court did so, explaining, "if the claim of immunity is recognized and allowed by the executive branch of the government, in this case the Department of State, it is then the duty of the court to accept such claim upon appropriate suggestion made by the Attorney General of

---

[5] In some cases, foreign sovereigns did not make requests to the State Department but asked the courts to extend immunity. <u>Verlinden</u>, 461 U.S. at 487-88. The question here is not whether a tribe might voluntarily subject itself to a court's determination of its immunity, but may insist on leaving that decision to the branch the United States Supreme Court has repeatedly held has the prerogative to make it—Congress.

the United States." Id. at 701 (citing The Navemar, 303 U.S. 68, 74, 58 S. Ct. 432, 82 L. Ed. 667 (1938)).

Flying T argues that Knocklong merely reflects an "exception to the exception" under which title disputes remained generally justiciable except in cases of diplomatic or consular property. But under the *Restatement (Second) of The Foreign Relations Law of the United States* § 77(4) (Am. L. Inst. 1965) (*Restatement (Second)*),[6] diplomatic premises were not exempt from determinations of title, but only from "prescription or enforcement of any tax or levy of the receiving state." A deed of trust might be foreclosed, for instance, but regaining possession depended on the territorial state resorting to "the ultimate sanction of termination of diplomatic status." Id. cmt. e, at 243; see also Cayuga Indian Nation of N.Y. v. Seneca County, N.Y., 978 F.3d 829, 840 (2d Cir. 2020) (unnecessary to determine whether immovable property exception applied because, even if it did, county's tax enforcement proceedings fell "comfortably within the absolute immunity from execution of judgment that foreign sovereigns traditionally enjoyed at common law."); City of New York v. Permanent Mission of India to the United Nations, 446 F.3d 365, 371 (2d Cir. 2006) (international convention still limits execution that would threaten a foreign sovereign's possession), aff'd and remanded, 551 U.S. 193; HAZEL FOX & PHILIPPA WEBB, THE

---

[6] The *Restatement (Second)* was the most recent restatement of foreign relations law when Congress enacted the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1602-1611, and is therefore evidence of international practice predating the statute. See Permanent Mission of India to the United Nations v. City of New York, 551 U.S. 193, 200, 127 S. Ct. 2352, 168 L. Ed. 2d 85 (2007).

LAW OF STATE IMMUNITY 484 (3d ed. 2015) ("State immunity continues to bar to a very large extent the enforcement of judgments given by such courts against foreign States."). Under the *Restatement (Second)*, sovereign immunity should not have protected the Kingdom of Afghanistan from a state court determination of title, though it would have afforded protection from execution of any judgment. The relevant point of Knocklong is that pursuant to then-current law the court abstained from adjudicating title against the foreign power at the direction of the executive branch.

In context, the dicta Flying T relies on in The Schooner Exchange establishes only that a territorial sovereign possesses authority over persons and property within its territory, including foreign sovereigns and their property.[7] The

---

[7] The Enlightenment era sources on which The Schooner Exchange drew, see Upper Skagit, 584 U.S. at 567-69 (Thomas, J., dissenting), focused on the authority of the territorial courts, not the conditions justifying the exercise of that authority, and equally recognized the authority of the political branches to direct that the courts extend immunity or not based on a political determination of national interest. These sources date from before modern states, and looked at the issue initially through the lens of the authority of territorial courts over the persons of monarchs and their legates. The Schooner Exchange cites Emmerich de Vattel as maintaining " 'It is impossible to conceive . . . that a Prince who sends an ambassador or any other minister can have any intention of subjecting him to the authority of a foreign power.' " 11 U.S. at 143 (quoting EMMERICH DE VATTEL, THE LAW OF NATIONS bk. 4, ch. 7, §§ 92 (1805)); see also ERNEST K. BANKAS, THE STATE IMMUNITY CONTROVERSY IN INTERNATIONAL LAW 34-38 (2d ed. 2022) (tracing Eighteenth Century discussions of immunity to medieval sources and ancient Roman law protecting the persons of imperial Roman legates). The Schooner Exchange dicta on which Flying T relies seems directed to the statement of Bynkershoek's more recently translated into English that "[t]hrough the practice of nations it has been established that property which a prince has purchased for himself in the dominions of another or has acquired through inheritance or in any other way, shall be treated just like the property of private individuals and shall be subject in equal degree to burdens and taxes." CORNELIUS VAN BYNKERSHOEK, DE FORO LEGATORUM LIBER SINGULARIS 22 (G. Laing transl. 1946). This statement appears to have been made in discussion of securing personal jurisdiction through

court did not examine the circumstances in which territorial courts would proceed to adjudicate the ownership of property within their territory claimed by a foreign sovereign, or support that courts should do so independently of the direction of the political branches of government. Granted, after The Schooner Exchange, American courts did not defer absolutely to the suggestion of the State Department. In Berizzi Brothers Co. v. The Pesaro, 271 U.S. 562, 576, 46 S. Ct. 611, 70 L. Ed. 1088 (1926), the court extended immunity to an Italian government-owned vessel engaged in commerce, despite the State Department's view that such vessels were not entitled to immunity, see Michael H. Cardozo, *Sovereign Immunity: The Plaintiff Deserves A Day in Court*, 67 HARV. L. REV. 608, 609 (1954). But diverging from the direction of the State Department was the exception. Id. at 608; FOX & WEBB, supra, at 146. The Schooner Exchange does not support, and Flying T does not show, any history of the judiciary invoking the immovable

---

attachment of property, but in any event Bynkershoek then described cases in which immunity was directed by political branches of government. The first was a case refusing to attach moneys on deposit by the German emperor. Id. at 22-23. Although Bynkershoek criticized the decision, he said this was because the decision to extend immunity based on a political determination is not appropriately made by the judicial department. Id. at 23. He next described a case involving Spanish warships, relied on by The Schooner Exchange, 11 U.S. at 145, in which the court issued an attachment but on protest of the Spanish ambassador the legislature extended immunity, DE FORO LEGATORUM, supra, at 23, and a case in which the legislature refused consent to attach the property of the countess of the Palatinate, id. He described three more cases concerning the elector of Brandenburg, the Venetian Republic, and the duke of Mecklenburg in which the legislature expressly allowed suits to proceed, and another involving the king of Prussia in which the case proceeded with the king's consent. Id. at 24-25. These cases all support the thesis that a foreign sovereign is subject to the authority of the territorial courts, but the decision whether to exercise that authority in specific cases depends on the direction of the political branches of government. This comports with United State Supreme Court precedent and the Tribe's position that only Congress can abrogate tribal sovereign immunity.

property exception against a foreign nation to disallow foreign sovereign immunity without regard to the direction of the political branches.[8]

2

Flying T points to a statutory provision allowing real property claims against foreign sovereigns. Congress codified the law of foreign sovereign immunity in the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1602-1611. Verlinden, 461 U.S. at 488. The FSIA contains an exception to immunity providing that a foreign state shall not be immune in any case in which "rights in immovable property situated in the United States are in issue." 28 U.S.C. § 1605(a)(4). This provision was "meant 'to codify . . . the pre-existing real property exception to

---

[8] Flying T's position problematically calls for a nondeferential, judicially established outer boundary on the immunity generally accorded to foreign sovereigns. It is not surprising that it supports this position exclusively with secondary sources generally recognizing the need for territorial courts to retain the authority to determine such matters as title—a proposition with which we have no quarrel—but cites no history of the judiciary of any nation routinely exercising such authority against fellow nations without regard to its political authorities' direction. The Schooner Exchange runs against the proposition that the judicial branch might decide on its own and without the counsel of the political branches to adjudicate a foreign sovereign's interest in property within the United States. After all, it was a case in which the government appeared to urge the court to extend immunity. The Schooner Exchange,11 U.S. at 117-18, 147. The American ship at issue had been taken unlawfully as part of Napoleon's efforts to impose a blockade against Britain, a policy that had caused resentment among dispossessed American shipowners. See GAMAL MOURSI BADR, STATE IMMUNITY: AN ANALYTICAL & PROGNOSTIC VIEW 10-14 (1984). But with war with the United Kingdom imminent—the War of 1812 was declared only three months after the decision in The Schooner Exchange—it was "politically inconceivable" that the American judiciary would seize a French warship to return it to its rightful American owners. BADR, supra, at 14. It is not difficult to imagine the State Department in Knocklong having similarly compelling concerns about a court proceeding against property claimed by the Kingdom of Afghanistan amidst 1950s Cold War tensions with the former Soviet Union. A nondeferential immovable property exception declaring such claims outside the scope of immunity would put such concerns beyond judicial accommodation.

sovereign immunity recognized by international practice.' " <u>Permanent Mission of</u> <u>India</u>, 551 U.S. at 200 (alteration in original) (quoting <u>Asociacion de Reclamantes</u> <u>v. United Mexican States</u>, 735 F.2d 1517, 1521 (D.C. Cir. 1984)). Under both theories of foreign sovereign immunity prevailing at the time,[9] "proceedings relating to immovables located in the territory of the forum State" fell within one of the "earliest widely accepted exceptions to State immunity." FOX & WEBB, <u>supra</u>, at 427. As framed in the *Restatement (Second)*, "The immunity of a foreign state . . . does not extend to . . . (b) an action to obtain possession of or establish a property interest in immovable property located in the territory of the State exercising jurisdiction."

But as <u>Knocklong</u> showed, no such rule was followed to the exclusion of the direction of the political branches. Foreign nations "often placed diplomatic pressure on the State Department in seeking immunity." <u>Verlinden</u>, 461 U.S. at 487. In some cases, "political considerations led to suggestions of immunity in cases where immunity would not have been available" under the prevailing theory. <u>Id.</u> Thus, even proponents of the restrictive view of immunity acknowledged that

---

[9] <u>The Schooner Exchange</u> came to be regarded as extending "virtually absolute" immunity to foreign sovereigns. <u>Verlinden</u>, 461 U.S. at 486. In 1952, the State Department's "Tate Letter" announced the United States' "decision to join the majority of other countries by adopting the 'restrictive theory' of sovereign immunity, under which 'the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (jure gestionis).' " <u>Permanent Mission of India</u>, 551 U.S. at 199 (quoting Letter from Jack B. Tate, Acting Legal Adviser, U.S. Dept. of State, to Acting U.S. Attorney General Phillip B. Perlman (May 19, 1952) (Tate Letter), reprinted in 26 Dept. of State Bull. 984 (1952), and in <u>Alfred Dunhill of London, Inc. v. Republic of</u> <u>Cuba</u>, 425 U.S. 682, 711, 712, 96 S. Ct. 1854, 48 L. Ed. 2d 301 (1976) (appendix 2 to opinion of the Court)). The FSIA was meant to codify the restrictive theory. <u>Permanent Mission of India</u>, 551 U.S. at 199.

the practical inability to enforce judgments against co-equal nations explained why questions of immunity turned on determinations of the political branches: the " 'general inability of the judicial power to enforce its decisions' " against foreign sovereigns prompts questions that are " 'rather questions of policy than of law,' " and " 'for diplomatic rather than legal discussion.' " FOX & WEBB, supra, at 32 (quoting Hersch Lauterpracht, *The Problem of Jurisdictional Immunities of Foreign States*, 28 BRIT. YEAR BOOK INT'L LAW 220 (1951)). With the passage of the FSIA, the former practice of looking to executive suggestion on a case by case basis gave way to determining the availability of immunity at Congress's direction. The parties agree the FSIA does not extend to tribes, but this only further justifies deferring to Congress's different approach to tribal sovereign immunity.

In the absence of comprehensive legislation by Congress regulating tribal sovereign immunity, the United States Supreme Court has upheld tribal sovereign immunity for claims for which the FSIA clearly waived foreign nations' immunity, such as for commercial claims. Cf. 28 U.S.C. § 1605(a)(2) (exception to immunity for "commercial activity carried on in the United States") with Kiowa, 523 U.S. at 760 ("Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation."). Kiowa contrasted Congress's more limited waiver of tribal sovereign immunity compared to its treatment of foreign sovereigns, and cautioned, "In both fields, Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests. The capacity of the Legislative

18

Branch to address the issue by comprehensive legislation counsels some caution by us in this area." Id. at 759.

Congress periodically revisits tribal sovereign immunity. After Kiowa, Congress "considered several bills to substantially modify tribal immunity in the commercial context," but instead of these "chose to enact a far more modest alternative requiring tribes either to disclose or to waive their immunity in contracts needing the Secretary of the Interior's approval." Bay Mills, 572 U.S. at 801-02 (citing Indian Tribal Economic Development and Contract Encouragement Act of 2000, § 2, 114 Stat. 46 (codified at 25 U.S.C. § 81(d)(2))). And again, "[j]ust eight months after the Supreme Court issued its decision in [Upper Skagit], Congress reaffirmed its approval of tribal immunity in the context of a statute that, among other things, authorizes Indian tribes to grant rights of way over their land for energy resource development." Self v. Cher-Ae Heights Indian Cmty. of Trinidad Rancheria, 60 Cal. App. 5th 209, 221, 274 Cal. Rptr. 3d 255 (2021) (citing Pub. L. No. 115-325, tit. I, §§ 103(a), 105(d) (Dec. 18, 2018), 132 Stat. 4447, 4454, codified at 25 U.S.C. § 3504(i)), cert. denied, 142 S. Ct. 1107, 212 L. Ed. 2d 7 (2022). The real property exception in the FSIA, even when characterized as a codification of common law, does not support imposition of a similar limitation on tribal sovereign immunity by the judicial branch without regard to Congress's direction.

3

Quoting Asociacion de Reclamantes, 735 F.2d at 1521, Flying T invokes a territorial sovereign's " 'primeval' " interest in resolving title disputes within its domain. In Asociacion de Reclamantes, then-Judge Scalia wrote that the

immovable property exception in the FSIA stemmed from the fact that "[a] territorial sovereign has a primeval interest in resolving all disputes over use or right to use of real property within its own domain," because " '[a] sovereignty cannot safely permit the title to its land to be determined by a foreign power.' " Id. (quoting 1 F. WHARTON, CONFLICT OF LAWS § 278 at 636 (3d ed. 1905)). The specter of a foreign sovereign laying claim to another's domestic realm and claiming immunity from adjudication of title is complemented by the local action rule, which places venue to determine title exclusively in the local forum. Id. at 1521-22. It is clearly necessary that the territorial sovereign reserve the authority to determine title disputes notwithstanding a foreign putative owner's claims of immunity, because the operation of the local action rule would leave no forum competent to determine title. Id. at 1522. But this fails to justify departure from deferring the question of the Tribe's immunity to Congress for two reasons. First, as discussed above, that the territorial sovereign retains the authority to determine title does not mandate that it must necessarily do so at the behest of any claimant, at any time, apart from considerations reserved to its political branches. Second, the Tribe's claim of immunity is subject to abrogation domestically by Congress, so it poses no threat to the properly defined dual sovereignty governing this land.

"[W]hen the States entered the federal system, they renounced their right to the 'highest dominion in the lands comprised within their limits.' " PennEast Pipeline Co., LLC v. New Jersey, 594 U.S. 482, 502, 141 S. Ct. 2244, 210 L. Ed. 2d 624 (2021) (quoting Cherokee Nation v. S. Kan. Railway Co., 135 U.S. 641, 656, 10 S. Ct. 965, 971, 34 L. Ed. 295 (1890)). Washington is the relevant

20

sovereign for purposes of substantive real property law. See Munday v. Wisconsin Tr. Co., 252 U.S. 499, 503, 40 S. Ct. 365, 64 L. Ed. 684 (1920) ("Where interstate commerce is not directly affected, a state may forbid foreign corporations from doing business or acquiring property within her borders except upon such terms as those prescribed by the Wisconsin statute."); United States v. Fox, 94 U.S. 315, 320, 24 L. Ed. 192 (1876) ("The power of the State to regulate the tenure of real property within her limits, and the modes of its acquisition and transfer, . . . is undoubted."). But Washington is not the exclusive sovereign for a purpose touching a federal concern. As Verlinden explained, in addition to codifying the law of foreign sovereign immunity, the FSIA permissibly guaranteed foreign sovereigns the right to remove any civil action from a state court to a federal court because of " 'the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area.' " 461 U.S. at 489 (quoting H.R. REP. NO. 94-1487, at 32 (1976)).

Verlinden held that, even in the absence of a federal claim, id. at 483, "an action against a foreign sovereign arises under federal law, for purposes of Article III jurisdiction," id. at 494. This followed from Congress's "authority over foreign commerce and foreign relations," and the recognition that "[a]ctions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States, and the primacy of federal concerns is evident." Id. at 493. Thus, a case brought against a foreign sovereign alleging a state law quiet title claim and falling within the immovable property exception of 28 U.S.C. § 1605(a)(4) would be originally cognizable in federal court and removable if commenced in

21

state court.  Verlinden, 461 U.S. at 488-89 & n.11.  And, if the claim did not fall within a FSIA exception, the foreign sovereign would be assured immunity at Congress's direction in both federal and state courts.  Id. at 489.  Therefore, it is already recognized that Washington's sovereignty over land within its boundaries is limited in that it may entertain suits against foreign sovereigns, even those concerning real property, only to the extent consistent with Congress's direction.

The Tribe's claim to immunity as allowed or disallowed by Congress is no more an imposition on Washington's sovereignty than a foreign sovereign's entitlement to immunity as allowed or disallowed by Congress under the FSIA. Congress's authority over the nation's relationships with tribes is equally "plenary" as its authority over foreign relations.  Bay Mills, 572 U.S. at 788; see also County of Oneida, N.Y. v. Oneida Indian Nation of N.Y. State, 470 U.S. 226, 234, 105 S. Ct. 1245, 84 L. Ed. 2d 169 (1985) ("With the adoption of the Constitution, Indian relations became the exclusive province of federal law.").  Recognizing the Tribe's immunity does not cede any territorial sovereignty, because the determination of title remains subject to the state's sovereignty over real property law and the nation's sovereignty over the determination of the Tribe's immunity.[10]

---

[10] That Congress may abrogate tribal sovereign immunity at will also answers any argument that honoring tribal sovereign immunity in real property cases might open up avenues for abuse.  For instance, in Cass County Joint Water Resource District v. 1.43 Acres of Land in Highland Township, a landowner in an area affected by a forthcoming public works project deeded land to the Turtle Mountain Band of Chippewa Indians, who subsequently claimed immunity against condemnation.  643 N.W.2d 685, 688 (N.D. 2002).  Relying, among other authorities, on Yakima and Anderson, the court allowed the condemnation to proceed based on the now discredited in rem exception.  643 N.W.2d at 692, 694. While not doubting the sincerity of the Turtle Mountain Band that it had no designs to frustrate public works, the court nevertheless expressed concern over the

4

Also lacking in the case of a tribe is the rationale on whose basis the United States Supreme Court has permitted certain actions by one State against another. In State of Georgia v. City of Chattanooga, the court held state sovereign immunity does not extend to "[l]and acquired by one State in another State." 264 U.S. 472, 480, 44 S. Ct. 369, 68 L. Ed 796 (1924). Georgia undertook the construction of a railroad extending from Atlanta, Georgia to Chattanooga, Tennessee. Id. at 478. Tennessee granted Georgia land for terminal facilities and the right to acquire the necessary right-of-way from the state line to Chattanooga. Id. Georgia did so, and Chattanooga later sought to take land from a railroad yard for a street. Id. at 478-79. The court held the power of Tennessee to take land for a street was not impaired by the fact another state owned the land for railroad purposes; acquiring land in another state for a private purpose prevented Georgia from claiming sovereign immunity. Id. at 479-80. "The terms on which Tennessee gave Georgia permission to acquire and use the land and Georgia's acceptance amount to consent that Georgia may be made a party to condemnation proceedings." Id. at

_____

uncertainty that could result from tribes having what it called "veto power" over projects through the acquisition of a small tract within a project. Id. at 694. But Congress's plenary authority over tribal immunity provides a ready check against assertions of immunity that Congress deems inappropriate. Underscoring the sensitive political considerations involved, Cass County rested its decision in part on the fact the land at issue was not part of the Turtle Mountain Band's aboriginal land. Id. at 694. In contrast, the land at issue here is part of the Tribe's ancestral land, and the Tribe's purposes in acquiring it serve protected treaty rights to take fish for ceremonial and subsistence purposes, and otherwise " 'in common' " with nontreaty right fishermen, United States v. Washington, 384 F. Supp. 312, 343 (W.D. Wash. 1974), aff'd and remanded, 520 F.2d 676 (9th Cir. 1975), and to preserve its heritage and culture. Balancing these profound interests against the need to adjudicate state law property rights lies with Congress.

480. But the United States Supreme Court has not looked to the law of State immunity to determine that held by tribes, and, to the contrary has cautioned "the immunity possessed by Indian tribes is not coextensive with that of the States." Kiowa, 523 U.S. at 756. As between States, "[w]hat makes the States' surrender of immunity from suit by sister States plausible is the mutuality of that concession. There is no such mutuality with either foreign sovereigns or Indian tribes." Blatchford v. Native Vill. of Noatak, 501 U.S. 775, 782, 111 S. Ct. 2578, 115 L. Ed. 2d 686 (1991).

C

The baseline rule is that a tribe is immune from suit unless it has consented to the suit or Congress has waived its immunity. The foregoing discussion shows that this baseline rule of deferring the question of immunity to a political branch of the national government parallels the immunity foreign sovereigns have been granted in American courts. So far, however, the discussion has assumed that the Tribe's immunity is properly determined by reference to the law governing the relationship among nation states foreign to one another. But tribes are not foreign to this land, and the relationship between the three domestic sovereignties implicated in this case further counsels deference to Congress.

From time immemorial, ancestors of the Coast Salish people dwelt along the rivers in the coastal and riverine lands of Puget Sound. See BRUCE G. MILLER, THE PROBLEM OF JUSTICE, TRADITION AND LAW IN THE COAST SALISH WORLD 1-2 (Gerald M. Sider et al. 2001); cf. Upper Skagit, 138 S. Ct. at 556 ("Ancestors of the Upper Skagit Tribe lived for centuries along the Skagit River in northwestern

Washington State."). Fishing constituted a means of subsistence for the tribal members in the area embracing the Stillaguamish River and its north and south forks, where the river system constituted the usual and accustomed fishing places of the tribe. United States v. Washington, 384 F. Supp. 312, 379 (W.D. Wash. 1974), aff'd and remanded, 520 F.2d 676 (9th Cir. 1975). The Tribe was identified as represented at the 1855 signing of the Treaty of Point Elliott, id. at 378, and in that treaty the Coast Salish tribes agreed to "cede, relinquish, and convey" the lands of present day northwestern Washington to the United States. TREATY BETWEEN THE UNITED STATES & THE DWÁMISH, SUQUÁMISH, & OTHER ALLIED & SUBORDINATE TRIBES OF INDIANS IN WASHINGTON, 12 Stat. 927, art. 1 (1855).[11]

---

[11] When the treaties were negotiated, "the translation of the English words was difficult because the interpreter used a 'Chinook jargon' to explain treaty terms, and that jargon not only was imperfectly (and often not) understood by many of the Indians but also was composed of a simple 300-word commercial vocabulary that did not include words corresponding to many of the treaty terms." Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n, 443 U.S. 658, 667 n.10, 99 S. Ct. 3055, 61 L. Ed. 2d 823, modified sub nom. Washington v. United States, 444 U.S. 816, 100 S. Ct. 34, 62 L. Ed. 2d 24 (1979). Beyond the problem of translation, the incoming American settler societies sought the treaties with the "express intention of undermining existing systems of leadership and spiritual values and practices" of the Coast Salish in the hopes of "quickly opening the area to settlement." MILLER, supra, 81, 93-94. Territorial Governor Isaac Stevens and the treaty commission "were aware that village leaders did not have authority beyond their families and friends," and therefore completed the treaties "by designating 'tribes and chiefs.' " OLYMPIC PENINSULA INTERTRIBAL CULTURAL ADVISORY COMM., NATIVE PEOPLES OF THE OLYMPIC PENINSULA 10-12 (Jacilee Wray 2d ed. 2015). And when settlers began entering the Puget Sound region pursuant to the 1850s treaties, Upper Skagit leaders who believed settlers were encroaching on their lands were limited by territorial authorities to seeking assistance from Congress. MILLER, supra, 94-95. With these background circumstances, the United States "has a responsibility to avoid taking advantage of the other side." Washington, 443 U.S. at 675-76.

The riparian lands of the Stillaguamish River are essential to the Tribe's interest in preserving its heritage and culture. "The anadromous fish constitute a natural resource of great economic value to the State of Washington," and "when the relevant treaties were signed, anadromous fish were even more important to most of the population of western Washington than they are today." Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n, 443 U.S. 658, 664, 99 S. Ct. 3055, 3063, 61 L. Ed. 2d 823, modified sub nom. Washington v. United States, 444 U.S. 816, 100 S. Ct. 34, 62 L. Ed. 2d 24 (1979). Diminishing the force of Flying T's reliance on international law to avoid the Tribe's immunity, these considerations are recognized in international law in its protecting from execution "property 'of great importance to the cultural heritage of every people.' " FOX & WEBB, supra, 532 (quoting Convention for the Protection of Cultural Property in the Event of Armed Conflict with Regulations for the Execution of the Convention art. 1(a), May 14, 1954, T.I.A.S. No. 09-313.1 [https://perma.cc/UV2S-PDUH].).

This is particularly salient in regard to the Tribe's effort to regain lands its ancestors possessed and whose management is essential to preserving its heritage and culture. The settlement of the 1850s treaties covering most of present day Washington[12] soon gave way to "Congress's late Nineteenth Century Indian policy: 'to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large.' " Upper Skagit, 584 U.S. at 558 (quoting Yakima, 502 U.S. at 254). Later, Congress "reversed course," and

---

[12] See Treaty of Medicine Creek, 10 Stat. 1132 (1854); Treaty of Point Elliott, 12 Stat. 927 (1855); Treaty of Point No Point, 12 Stat. 933 (1855); Treaty of Neah Bay, 12 Stat. 939 (1855); Treaty of Olympia, 12 Stat. 971 (1855).

sought to restore " 'tribal self-determination and self-governance.' " Id. (quoting Yakima, 502 U.S. at 255). In Self, the court considered similar facts, where plaintiffs filed suit to quiet title to a public easement over coastal land that a tribe was seeking to bring into trust. 60 Cal. App. 5th at 213-15. The court explained that "supporting tribal land acquisition is a key feature of modern federal tribal policy, which Congress adopted after its prior policy divested tribes of millions of acres of land." Id. at 219. Congress's later reversal, among other things, "empowers the federal government to take land into trust for the benefit of a tribe." Id. at 220 (citing 25 U.S.C. § 5108). Congress's policy now "advances tribes' sovereign interests by helping them restore land they lost." Id.

When coupled with only targeted waivers of tribal sovereign immunity, Self explained, "This history weighs strongly in favor of deferring to Congress to weigh the relevant policy concerns of an immovable property rule in light of the government's solemn obligations to tribes, the importance of tribal land acquisition in federal policy, and Congress's practice of selectively addressing tribal immunity issues in property disputes." Id. at 221. We agree,[13] and the same is true here. Congress's land acquisition policy is especially relevant to riverine lands in the Puget Sound region, where degradation of salmon habitat and reduced abundance of salmon have resulted in continuing cultural, social, and economic harm to tribes. United States v. Washington, 20 F. Supp. 3d 986, 1020-21 (W.D. Wash. 2013). The Tribe has not indicated it has sought to take the land into trust, but it

---

[13] We also agree with Self's conclusion that Chattanooga and The Schooner Exchange, together with related authorities, do not support extending a common law exception for immovable property to tribes. 60 Cal. App. 5th at 216-18.

nevertheless avers it obtained the land with federal funds based on a commitment to protect the land for salmon recovery, an effort essential to preserving its culture and heritage. Deciding whether to subject tribal land acquisition to private suits thus requires balancing the longstanding and pre-constitutional interests of the tribes, and national policy, against any competing state law property interests. This shows why the United States Supreme Court has deferred tribal sovereign immunity to Congress.

That Flying T may lack a present judicial remedy as long as the Tribe retains immunity is not a basis to decide the question differently. The United States Supreme Court has left open the possibility that tribal sovereign immunity might bow to a claimant lacking any alternative remedies. Bay Mills, 572 U.S. at 799 n.8. But it has rejected the proposition that the elimination of a claimant's "most efficient" remedy is a ground to set aside tribal sovereign immunity where there are "any adequate alternatives." Potawatomi, 498 U.S. at 514. Flying T's remedy lies with Congress, and in this regard it is similarly situated to litigants in much of the nation's history who have been dependent on the national legislature's decision whether to authorize a remedy within its discretion to grant or withhold.

The United States claims the same immunity from claims such as Flying T's.[14] See United States v. Testan, 424 U.S. 392, 399, 96 S. Ct. 948, 47 L. Ed. 2d

---

[14] And Washington asserts the same prerogative. Gorman v. City of Woodinville, 175 Wn.2d 68, 72, 283 P.3d 1082 (2012) ("State-owned land is statutorily protected from claims of adverse possession."); State ex rel. Hamilton v. Superior Court for Cowlitz County, 200 Wash. 632, 634-35, 94 P.2d 505 (1939) (Allowing claim to set aside deed allegedly procured by the state by fraud to proceed in Cowlitz County rather than Thurston County.).

114 (1976) ("It has long been established, of course, that the United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'") (alteration in original) (quoting United States v. Sherwood, 312 U.S. 584, 586, 61 S. Ct. 767, 85 L. Ed. 1058 (1941)); United States v. Alabama, 313 U.S. 274, 282, 61 S. Ct. 1011, 1014, 85 L. Ed. 1327 (1941) ("A proceeding against property in which the United States has an interest is a suit against the United States."). Under the Quiet Title Act, the United States allows some title claims to be brought against it, but it does not permit title to be determined against it "based upon adverse possession." 28 U.S.C. § 2409a(n). If the United States had acquired the land neighboring Flying T's parcel—instead of using its funds to support the Tribe to do so—Flying T would be limited to the remedies traditionally available in the absence of a waiver of sovereign immunity.

Before the Quiet Title Act, these remedies furnished claimants asserting title to land claimed by the United States "only limited means of obtaining a resolution"—"they could attempt to induce the United States to file a quiet title action against them, or they could petition Congress or the Executive for discretionary relief." Block v. N. D. ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 280, 103 S. Ct. 1811, 75 L. Ed. 2d 840 (1983). And for decades, petitioning Congress through the "private bill procedure" was the exclusive remedy for any claim against the United States. United States v. Mitchell, 463 U.S. 206, 212-13, 103 S. Ct. 2961, 77 L. Ed. 2d 580 (1983). These same remedies are available to Flying T. Given the right to seek relief from Congress, even if doing so is

29

inconvenient, and given Congress's history of periodic, targeted waivers of tribal sovereign immunity, Flying T does not lack "any adequate alternatives." Potawatomi, 498 U.S. at 514.

"[I]t is fundamentally Congress's job," not the judicial department's, "to determine whether or how to limit tribal immunity." Bay Mills, 572 U.S. at 800. To hold otherwise would impermissibly lessen tribal sovereign immunity compared to the immunity afforded foreign nations. Until Congress provides otherwise, the Tribe has immunity from Flying T's claims and the superior court properly dismissed those claims. With this conclusion, it is not necessary to reach any other issues raised by the parties.

Affirmed.

_____
Birk, J.

WE CONCUR:

_____          _____
Feldman, J.                                              Dwyer, J.